RECEIVED

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

2021 DEC -7 P 5: 22

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| | ; | |
| COURTNEY GRAVES, ESQ (*Pro Se*) | : | |
| 200 N. Washington Street, Unit 320547 | : | |
| Alexandria, VA 22320 | : | |
| (571) 771-7818 | : | |
| CourtneyGravesEsq@gmail.com | : | |
| | : | Civ. No. 1:21-CV-1367 MSN/TCB |
| Plaintiff, | : | |
| v. | : | |
| | : | COMPLAINT FOR |
| FOULGER-PRATT COMPANIES, LLC, | : | INJUNCTIVE AND |
| 12435 Park Potomac Avenue, Suite 200 | : | EQUITABLE RELIEF |
| Potomac, MD 20854 | : | |
| Directly and as parent to | : | |
| FOULGER-PRATT RESIDENTIAL, LLC | : | |
| c/o Foulger-Pratt Companies, LLC | : | |
| 12435 Park Potomac Avenue, Suite 200 | : | |
| Potomac, MD 20854 | : | **JURY TRIAL DEMANDED** |
| | : | |
| FOULGER-PRATT MANAGEMENT, LLC | : | |
| c/o Foulger-Pratt Companies, LLC | : | |
| 12435 Park Potomac Avenue, Suite 200 | : | |
| Potomac, MD 20854 | : | |
| | : | |
| FOULGER-PRATT DEVELOPMENT, LLC | : | |
| c/o Foulger-Pratt Companies, LLC | : | |
| 12435 Park Potomac Avenue, Suite 200 | : | |
| Potomac, MD 20854 | : | |
| | : | |
| FOULGER-PRATT CONTRACTING, LLC | : | |
| c/o Foulger-Pratt Companies, LLC | : | |
| 12435 Park Potomac Avenue, Suite 200 | : | |
| Potomac, MD 20854 | : | |
| | : | |
| THORNTON RESIDENTIAL HOLDINGS | : | |
| TITLE HOLDER LLC | : | |
| c/o Foulger-Pratt Companies, LLC | : | |
| 12435 Park Potomac Avenue, Suite 200 | : | |
| Potomac, MD 20854 | : | |

THORNTON RESIDENTIAL HOLDINGS LLC    :
c/o Foulger-Pratt Companies, LLC              :
12435 Park Potomac Avenue, Suite 200      :
Potomac, MD 20854                                     :
                                                                    :
FP ALEXANDRIA, LLC                              :
c/o Foulger-Pratt Companies, LLC              :
12435 Park Potomac Avenue, Suite 200      :
Potomac, MD 20854                                     :
                                                                    :
SREIT THORNTON AT ALEXANDRIA, L.L.C.  :
1601 Washington Avenue, Suite 800           :
Miami Beach, FL 33139                             :
                                                                    :
ENVIROMENTAL SOLUTIONS INC.             :
13101 N. Enon Church Road                        :
Chester, VA 23836                                      :
                                                                    :
PROGRESS ENVIROMENTAL, LLC             :
401 Ritchie Road,                                        :
Capitol Heights, MD 20743                          :
                                                                    :
COMPLIANCE ENVIROMENTAL              :
INTERNATIONAL, INC.                             :
509B McCormick Drive                               :
Glen Burnie, MD 21061                              :
                                                                    :
R. CHRISTOPHER GOODWIN &               :
ASSOCIATES, INC.                                    :
241 E 4ᵗʰ Street, Suite 100                          :
Frederick, MD 21701                                  :
                                                                    :
ROBERT J. ROBERTON,                            :
t/a APARTMENT RETORERS,                      :
d/b/a APARTMENT RESTORERS, LLC          :
3425 Kemptown Church Road                       :
Monrovia, MD 20850                                  :
                                                                    :
TOMAS MANOSALVA                              :
*Solely in his personal capacity*                   :
8711 Victoria Road                                      :
Springfield, VA 22151                                :

TAM GENERAL CONTRACTING, LLC            :
8711 Victoria Road                      :
Springfield, VA 22151                   :
                                        :
CITY OF ALEXANDRIA                      :
301 King Street                         :
Alexandria, VA 22314                    :
    ALEXANDRIA OFFICE OF HOUSING   :
    c/o CITY OF ALEXANDRIA         :
    421 King Street, Suite 215     :
    Alexandria, VA 22314           :
                                        :
    OFFICE OF HISTORIC ALEXANDRIA  :
    ALEXANDRIA ARCHAELOGY          :
    c/o CITY OF ALEXANDRIA         :
    220 N Washington Street        :
    Alexandria, VA 22314           :
                                        :
    DEPARTMENT OF CODE             :
    ADMINISTRATION                 :
    c/o CITY OF ALEXANDRIA         :
    301 King Street                :
    Alexandria, VA 22314           ;
                                        :
    BOARD OF ARCHITECTURAL REVIEW  ;
    c/o CITY OF ALEXANDRIA         ;
    301 King Street                ;
    Alexandria, VA 22314           :
                                        :
ENVIROMENTAL PROTECTION AGENCY and      :
MICHAEL S. REGAN, in his official capacity as  :
Administrator of the United States Environmental  :
Protection Agency                       :
1200 Pennsylvania Avenue, NW            :
Washington, DC 23219                    :
                                        :
OFFIT KURMAN, P.A.                      :
7501 Wisconsin Avenue, Ste. 1000W       :
Bethesda, MD 20814                      :
                                        :
HUNTER WARFIELD, INC.                   :
c/o Ray Sherbill or David Kay           :
7600 Wisconsin Avenue, Ste. 700         :
Bethesda, MD 20814                      :
                                        :

## COMPLAINT AND APPLICATION FOR INJUNCTION

COME NOW the Plaintiff, Courtney Graves (hereinafter "Plaintiff"), moves this Court for:

(1)     A permanent injunction to enjoin Defendants City of Alexandria with its departments (collectively hereinafter "City") and Foulger-Pratt Companies, LLC with its entities (collectively hereinafter "Foulger-Pratt") establish a Supplemental Environmental Project (SEP) in accordance with the Environmental Protection Agency's (hereinafter "EPA") SEPs Policy for asbestos and brick kiln emissions to prevent the threatened release of hazardous waste and hazardous air pollutants (hereinafter "HAPs") that harmed Plaintiff and continue harming the public and environment;

(2)     Find City and Foulger-Pratt violated the Clean Air Act (hereinafter "CAA") by failing to undertake appropriate response actions in accordance with the National Emissions Standard for the Hazardous Air Pollutant (hereinafter "NESHAPS");

(3)     Find Foulger-Pratt violated the Toxic Substances Control Act (hereinafter "TSCA") by knowingly and willingly failing to undertake appropriate response actions to the threatened release of HAPs;

(4)     Find Foulger-Pratt violated the Fair Housing Act (hereinafter "FHA") by failing to approve Plaintiff's request for a reasonable accommodation to transfer apartments due to Plaintiff's wheezing and airway obstruction resulting from inhaling HAPs within the apartment;

(5)     Find R. Christopher Goodwin & Associates, Inc. (hereinafter "RCG&A"), Progress Environmental, LLC (hereinafter "PE"), Compliance Environmental International, Inc. (hereinafter "CEI"), Apartment Restorers, LLC (hereinafter "AR"), and Environmental Solutions Inc. (hereinafter "ESI") conspired to conceal Foulger-Pratt's mishandling of HAPs in violation of Federal, State, and Local Environmental Regulations;

(6)     Find City and Foulger-Pratt engaged in witness tampering to obstruct justice by precluding Plaintiff from exposing injuries caused by HAPs at Fougler-Pratt's The Thornton residential apartment complex;

(7)     Find Foulger-Pratt, Thomas Manosalva (hereinafter "Manosalva"), TAM General Contracting, LLC (hereinafter "TAM"), Offit Kurman, P.A. (hereinafter "Kurman"), and Hunter Warfield, Inc. (hereinafter "Warfield") misrepresented services rendered and invoices to fraudulently induce payments for alleged property damage in violation of the Fair Debt Collection Practices Act (hereinafter "FDCPA");

(8)     Find Foulger-Pratt negligently caused Plaintiff's pain and suffering by failing to maintain safe premises and allowing the accumulation of HAPs inside of Plaintiff's apartment;

(9)     Find Foulger-Pratt intentionally inflicted emotional distress by apparently withholding knowledge that HAPs caused Plaintiff's severe harm to include an airway obstruction as she remained in the apartment for over thirty (30) days struggling to breathe, is utterly intolerable in a civilized community and caused Plaintiff severe distress from the physical pain and mental anguish;

(10)    Such other and further injunctive relief as the Court may deem appropriate, and in support thereof state as follows; and

(11)    Judgment against Defendants for equitable remedies to include compensatory and punitive damage to be subsequently disclosed in amendment, and such other and further equitable remedies as the Court may deem appropriate;.

(12)    Grant Plaintiff's leave of this Court to Amend Complaint 60-days from filing and receipt of formal letters to cure citizen suit notice of intent to sue.

**COMPLAINT**

## SUMMARY OF ACTION

1.      This case involves the fraudulent misconduct by Foulger-Pratt to include the Foulger-Pratt entities (collectively hereinafter "Foulger-Pratt") and City with its departments (collectively hereinafter "City") in connection with their establishment of The Thornton residential apartment complex.  Foulger-Pratt and City conspired to conceal the presence of HAPs such as asbestos, carbon, crystalline silica, and volatile organic compounds ("VOCs") in violation of the CAA and TSCA.

### *The 2019 HAPs Release Post 2016 HAPs Release*

2.      On September 29, 2019, Plaintiff vacuumed her bedroom carpet for the first time, which apparently was saturated with toxic substances.  Plaintiff's new vacuum lacked an HEPA filter.  Plaintiff noticed a gust of smoke above the vacuum and imminently felt something slice her lip, throat, and nostrils like a papercut.  Plaintiff turned the vacuum off as her throat and nostrils burned like she inhaled chlorine.  Plaintiff coughed all night with increased pressure behind her eyes that caused a severe migraine.  Plaintiff's scalp and eyelids swelled.  Plaintiff's symptoms seized after departing the apartment but progressed to more severe symptoms upon each return depending on the duration of stay.  Plaintiff's severe symptoms include respiratory, gastric, cardiac, and nervous system complications such as wheezing, chronic diarrhea, heart irregularity, severe migraines, facial swelling, night sweats, and body aches.

3.      On October 7, 2019, Plaintiff notified Foulger-Pratt of the toxic exposure via email to the following Foulger-Pratt executives: Bryan C. Foulger (Managing Partner & Chief Operating Officer), Cameron Pratt (Managing Partner & Chief Executive Officer), Brent K. Pratt (Board of Directors), Michael Abrams (Managing Director), Michael A. Otte (Residential Maintenance Director), Michelle Partridge (Senior Regional Residential Property Manager),

3
**COMPLAINT**

Tymeka D. Penn (Regional Residential Property Manager), and Alison Punsalan (Senior Vice President of Property).  Unaware of Foulger-Pratt's 2016 mishandling of asbestos and accumulated dust, Plaintiff prematurely limited the possible cause of harm for medical evaluations to mold exposure, which was an ongoing debate at The Thornton.  Foulger-Pratt's Regional Property Manager, Michelle Partridge (hereinafter "FP-Partridge") represented Foulger-Pratt's interests.  Plaintiff requested the following: air testing, new carpet, and an exterminator to reduce small black spiders scattered across the bedroom's crown molding and ceiling.  Foulger-Pratt strategically concealed the toxins and prioritized Plaintiff's remedial requests by removing the bedroom carpet first without performing any testing, which prevented Plaintiff from receiving proper medical treatment and interfered with evidence that this Court would rely on to establish their liability.

4.      Foulger-Pratt refused again to test Plaintiff's apartment.  Specifically, AR's Robert Ramsey (hereinafter "AR-Ramsey") inspected Plaintiff's apartment and quickly concluded with the company's mantra – no moisture no mold.  AR's first inspection was prior to the September 29, 2019, exposure because of Plaintiff's apparent visible mold presence on move-in day and black specular bugs on the bedroom and living room ceilings with a centipede caucus in the bedroom that allegedly lacked a moisture problem.  According to FP-Partridge, centipedes don't exist on the property, but Plaintiff ran from five (5) in her new apartment and left her new apartment sparkling clean with a centipede caucus in the bedroom for Foulger-Pratt to know they do exist on the property.  According to AR-Ramsey, he is not a bug specialist and could not explain the presence of the insects nor could AR-Ramsey explain the results of a mold home test kits.  AR-Ramsey sarcastically asked Plaintiff whether she knew what "ND" meant, which Plaintiff knew was an abbreviation for "Not Detected" and Plaintiff refrained from asking

about the three (3) molds present in the apartment.  AR-Ramsey simply concluded that the home

testing kits were not reliable.   Notably, the mold spores detected on the home test kits matched

Plaintiff's and Foulger-Pratt's expert testing test kits.  In response to Plaintiff's request for

testing during the first inspection by AR prior to Plaintiff's September 29th HAPs exposure, AR-

Ramsey claimed Plaintiff's request for testing was under review by management but before

departing Plaintiff's apartment, turned around, and asked what Plaintiff was going to do next,

which suggested that he knew a problem existed and testing would not be approved to disclose it.

   5.    On October 7, 2019, Plaintiff notified City of the toxic exposure.  Specifically,

Plaintiff submitted an online complaint for the Board of Housing Authority Board to review at its

next meeting, which was never reviewed by the board because Plaintiff's complaint was

immediately closed by City's Housing Authority Director Melodie Seau (hereinafter "City-

Seau").  City-Seau represented City of Alexandria's interest during the matter.  After review of

Plaintiff's complaint to include the AR inspection and Plaintiff's mold testing results, City-Seau

concluded the following:

> I will say that my review of the information you sent me does not
> indicate, as required by the Virginia Code, that there is a condition
> in the unit "that constitutes a material noncompliance by the
> landlord with the rental agreement or with provisions of law or
> that, if not properly corrected, will constitute a fire hazard or
> serious threat to life, health, or safety of occupants of the premises
> [. . .]" [City-Seau Email Dated 10/15/2019]

City-Seau also explained that if it was her that she would just wipe up the mold and sweep away

the spiders.

   6.    City-Seau also disclosed that she verified AR's license.  Notably, AR has an

inactive Virginia business registration, and the owner appears to have not filed AR's trade name

as required by law in Virginia.[1] Although City-Seau allegedly claimed that she had not spoken to Plaintiff as Plaintiff requested out of concern regarding Foulger-Pratt's past retaliatory behaviors, City-Seau was able to offer Plaintiff an exit out of her lease agreement with Foulger-Pratt without any liability.

7.     Testing was not approved then nor was it approved after AR's second visit after the HAPs release. During this visit, another man from AR explained there was no sign of moisture presence like a large amount of dust and debris. Plaintiff shook her new vacuum container that ran for less than 60 seconds and was full of dust and debris that spilled onto the floor causing the AR inspector to jerk back and immediately conclude the inspection by departing Plaintiff's apartment. City-Seau stated that City's' Code Administration (hereinafter "City-Code") did not perform testing. City-Seau also explained that Foulger-Pratt was new and would not need an inspection.

8.     While Foulger-Pratt conspired to conceal the presence of HAPs by refusing to grant Plaintiff's request for air testing, City also conspired to conceal identifying HAPs by refusing to issue a Special Use Permit (hereinafter "SUP") to authorize City to perform air testing. Foulger-Pratt and City hoped Plaintiff would accept the offer to exit the lease without liability. Plaintiff saw two (2) general practitioners, allergist, pulmonologist, and ENT to have a draw blood for mold, receive prick tests for allergies, check for asthma, have chest X-ray, and facial CT scan performed. Plaintiff did not have asthma, environmental allergies, or sinus

---

[1] Va. Code 59.1-75," An individual or business, legal, or commercial entity that conducts or transacts business under an assumed or a fictitious name without making the required filing is subject to being convicted of a misdemeanor, punishable by a fine not exceeding $2,500 or confinement in jail for not more than one year, or both." See also, Va. Code 59.1-76, "In addition, the person is precluded from maintaining an action in any courts of the Commonwealth." Va. Code Section 59.1-76.

complications, and mold was not found in Plaintiff's blood. As a result, Plaintiff stayed until testing was granted to receive adequate medical treatment.

9.      On November 6, 2019, Foulger-Pratt disclosed that they would "further investigate" Plaintiff's health and safety complaints. Plaintiff captured ESI-Thorne expose Foulger-Pratt's scienter because Plaintiff installed surveillance and noticed ESI-Thorne never checked sources of moisture like sinks and refrigerators. Rather, ESI-Thorne appeared to know mold was not the cause of Plaintiff's harm and took photographs of Plaintiff's closed alcohol bottles on the counter and a small red candle with a black wick located on the coffee table. Apparently, ESI-Thorne knew exactly where the HAPs were located by allocating his resources to certain locations in the apartment. Plaintiff noticed a large dent in the bathroom wall as if it was tested, but upon subsequent verification of tests performed, FP-Partridge stated that Plaintiff had all the testing results.

10.     ESI's test results misrepresent the contamination level because the total amount of VOCs was identified as a "High" VOC level of 3,400 ng/L (above 3,400 ng/L is "Severe") with the largest VOC contributor being Ethanol at 1,400 ng/L. The charts identify the amount of each VOC as the following: 873 ng/L for Building Materials, 250 ng/L for Mixed Building Materials and Lifestyle, and 2,332 ng/L Lifestyle Materials for a total amount of 3,455 ng/L, which is a "Severe" VOC level. The results showed "Elevated" concentrations of Formaldehyde detected at 75 ng/L (most homes have between 30 and 70 ng/L). The following were the carbon dioxide readings:

> The readings from the apartment lobby (564 ppm), outside the apartment front door (1029), at the opposite end of hallway outside apartment door (823 ppm), and around the apartment. The readings through the apartment were in the range of 1326 to 1379 ppm. The HVAC was engaged during the time of inspection.

7
**COMPLAINT**

Upon subsequent research, Plaintiff discovered ESI-Thorne was an asbestos specialist.  A list of reportable EPA's HAPs for this air sample were on the last page to include: hexane (C 6), benzene, toluene, ethylbenzene, m,p-Xylene, o-Xylene, Styrene, and naphthalene.

11.    On December 7, 2019, Plaintiff transferred at no-cost or liability to apartment N-120 (hereinafter "N-120").  Plaintiff's exposure to HAPs continued for over thirty (30) days as Foulger-Pratt refused a litany of requests to test the air, which resulted in Plaintiff's exposure to harmful substances that caused directly caused an imminent onset of severe respiratory conditions to include an extrathoracic upper airway obstruction and subsequent cardiac complications among other unhealthy exposures.   The transfer was finally granted based on ESI's testing results.  According to FP-Partridge, Foulger-Pratt would need to break through a wall to access the HVAC.

12.    Notably, Plaintiff noticed carbon dioxide levels were high in both apartments, N-210 and N-120.  Plaintiff repeatedly passed law enforcement and fire department trucks that were responding to The Thornton's blaring alarms and flashing lights at the entryway that was the carbon monoxide alarms.

13.    After the transfer, Foulger-Pratt allegedly wanted to help reduce Plaintiff's financial distress during the holidays by providing Plaintiff with a refund.  Foulger-Pratt asked Plaintiff to sign a non-disclosure agreement in the leasing office at The Thornton.  Plaintiff read the non-disclosure agreement that was stated settlement agreement at the bottom of the document and hidden in the middle pages was a waiver of all liability.  Plaintiff refused to sign the agreement but received a refund check in the mail sent from Foulger-Pratt's principal place of business in Maryland.  Plaintiff inquired about the refund check since she refused to sign the agreement, and Foulger-Pratt explained that the check was inadvertently sent to Plaintiff.

*2016 HAPs Release Unknown to Plaintiff During 2019 HAPs Release*

14.     Plaintiff investigated the history of the site and first discovered the EPA's stop work order for failing to remove and properly dispose of asbestos-related materials at the residential apartment complex across the street called Hunting Point.  Further investigation discovered asbestos at another residential apartment complex across the street called Hunting Towers, which was abated by the Virginia Department of Transportation (hereinafter "VDOT") during the Woodrow Wilson Bridge Project.  Subsequently, Plaintiff's Freedom of Information Act (hereinafter "FOIA") requests confirmed Foulger-Pratt's mishandling of asbestos materials. Specifically, Foulger-Pratt found asbestos prior to constructing The Thornton during the demolition of the former residential apartment complex called Hunting Terrace.  VDOT previously owned Hunting Terrace and found asbestos in three (3) of the eight (8) residential structures that VDOT demolished to construct a sound barrier for the Woodrow Wilson Bridge Project.

15.     FOIA records disclosed Foulger-Pratt's building permits for demolition of the remaining five (5) residential structures that required asbestos abatement.  Compliance Environmental International Inc. (hereinafter "CEI") filed an asbestos abatement verification on behalf of Foulger-Pratt prior to issuance of Foulger-Pratt's demolition permit.  Notably, the Occupational Safety and Health Administration (hereinafter "OSHA") received an asbestos complaint after Foulger-Pratt's notice of compliance and CEI's asbestos abatement verification, which was opened and closed on March 24, 2016.  FOIA records omitted a stop work order and a subsequent permit for asbestos testing, abatement, or certification as required by permit regulations.

9
**COMPLAINT**

16.     In addition to the OSHA report of an asbestos release post abatement, Foulger-Pratt encountered 1940s materials during excavation and preservation of brick kilns and failed to request a mandatory subsequent asbestos permit. RCG&A assisted Foulger-Pratt with the archaeological investigation during the preservation of brick kilns and disclosed Foulger-Pratt's use of 1940s sand to fill exposed brick kilns in the report titled, Archaeological Monitoring and Documentation of Site 44AX033 (Alexandria Brick Company) at The Thornton, 1199 S. Washington Street, Alexandria, Virginia, prepared by Foulger-Pratt (hereinafter "Brick Kiln Preservation Report"). Specifically, RCG&A's Principal Investigator was Kathleen M. Child, M.A. (hereinafter "RCG&A-Child") worked with Foulger-Pratt and Alexandria Archaeology (hereinafter "City-AA") to document the exposure of three (3) early twentieth century kiln structures, archaeological monitoring of mechanically-excavated exploratory trenches, and preservation methods.

17.     The Brick Kiln Preservation Report disclosed Foulger-Pratt's usage of 1940s sand used during the construction of Hunting Terrace and sold by the Alexandria Brick Company to fill the exposed kilns during preservation. Notably, the Brick Kiln Preservation Report did not indicate testing was performed of any 1940s materials discovered or used for preservation or any subsequent permit requests. Similarly, FOIA records omit soil testing by Foulger-Pratt. Upon information and belief, the aforementioned Defendants relied on a former site survey prepared by VDOT during its demolition, which likely may have involved asbestos releases during construction of the sound barrier located by brick kilns. FOIA records disclosed emails between the aforementioned Defendants that discussed how Foulger-Pratt and its engineers exposed brick kilns, disturbed black soil and coal waste that was contained in brick rubble and disturbed a sewer trench from the former 1940s apartment complex. As expected, FOIA records lacked a

discussion of subsequent testing or permits for asbestos and hazardous emissions after Foulger-Pratt disturbed 1940s soil, coal waste, and sewers.

18.     In addition to Foulger-Pratt's failure to comply with asbestos permits and mishandling of the 1940s substances and structures during construction, City-Code's building permit indicated that Foulger-Pratt failed to meet requirements for properly managing dust in violation to Alexandria's Ordinance 1546, "Smoke Control Code" that regulated dust accumulation during construction and demolition.  According to Foulger-Pratt's building permits for The Thornton, Progress Environmental, LLC (hereinafter "FP-PE") was the contractor responsible for maintaining compliance with federal, state, and local environmental laws during construction.

19.     During the archaeological preservation of the Alexandria Brick Company's brick kilns during construction, City knew or recklessly disregarded that Foulger-Pratt was falsely complying with the CAA, TSCA, Code of Virginia (hereinafter "Va. Code"), Virginia Uniform Statewide Building Code (hereinafter "Va. Building Code"), and Alexandria's Air Pollution Control Code Ordinance No. 1545 (1969) (hereinafter "Air Pollution Control Code"), and failed to take required action to prevent hazardous waste and HAPs releases from harming the public and the environment.  Specifically, Foulger-Pratt and City concealed hazardous emissions such as asbestos, carbon, HAPs, and apparent volatile organic compounds (hereinafter "VOCs") to thereby fraudulently induce tenants to enter lease agreements and investors to purchase securities offered by Starwood Capital, L.L.C. (hereinafter "FP-SREIT-SC").  FP-SREIT-SC's Dealer Manager/Member FINRA & SIPC omitted the site's history of asbestos contamination on the Starwood Real Estate Income Trust, Inc.'s (hereinafter "FP-SREIT") Summary of Risk Factors in the sales and advertising literature for The Thornton investments.  In so doing, Foulger-Pratt

and City failed to exercise due professional care and skepticism during demolition, excavation, preservation, and construction in violation of the CAA and TSCA, which resulted in damaging the health and welfare of the public to include harming the Plaintiff.

20.     In furtherance of Foulger-Pratt's conspiracy to conceal threatened harmful releases, PE, CSI, ESI, and AA played an active role in aiding and abetting Foulger-Pratt and City's conspiracy to conceal their mishandling of hazardous materials and their liability for neglecting their duty to protect human health and the environment.  Similarly, Kurman, Warfield, TAM, and Mansolava aided and abetted in concealing Foulger-Pratt's grave misconduct by pursuing fraudulent invoices for services rendered by TAM or Mansolava to repair alleged structural damages, which likely intended to portray Plaintiff as contributory negligent because Plaintiff allegedly caused structural damages that contributed to the VOCs and HAPs release.  However, the misrepresentations were exposed when Plaintiff confirmed the photographs of the alleged damages were taken in the living room and TAM's invoice identified the services were performed to the bedroom ceiling.  Upon Kurman's receipt of Plaintiff's intent to file a lawsuit for violating the FDCPA, Kurman offered a settlement that Plaintiff denied avoiding double jeopardy.  Upon information and belief, Warfield also received Plaintiff's notice of intent to file a lawsuit for fraudulent inducements and misrepresentations in violation of the FDCPA; however, Warfield continues to mail letters pursuing a fraudulent debt.

21.     As a result of Defendants' fraudulent misconduct and reckless disregard for the safety of humans and the environment, Foulger-Pratt and City must immediately test the site for asbestos and HAPs.  In addition, Foulger-Pratt and City must establish a SEP in accordance with the EPA's SEPs Policy for threatened release of hazardous waste and HAPs.  The EPA should also consider establishing a Superfund Site at The Thornton and identify City and Foulger-Pratt

as the site's potentially responsible parties (hereinafter "PRP") due to the complexity of the site

containing asbestos, preserved brick kilns, buried 1940s structures (sewers) and materials (sand),

located by the Potomac River with two (2) structures currently containing toxic substances and

releasing HAPs that continue to threaten harming residents, the public, and our environment.

## JURISDICTION AND VENUE

22.      This case arises under 42 U.S.C. § 7413(c), 15 U.S.C. § 2603, 42 U.S.C. § 3604,

18 U.S.C. § 371, 18 U.S.C. § 1001(a)(2), 18 U.S.C. § 1512(b), 15 U.S.C. § 1692 and other

statutes.  Jurisdiction is based on 28 U.S.C. § 1331 (federal question).  Plaintiff invokes the

supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear the claims arising

under state law.

23.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391 as a substantial part of

the events giving rise to Plaintiff's claims arose in the Eastern District of Virginia, and because

the property at issue is in this judicial district.

24.      Plaintiff reserves the right to bring CAA and TSCA citizen suits.  42 U.S.C. §

7604.  Initially, Plaintiff informally emailed the following agencies at least 60 days prior to filing

this complaint on the following dates: Foulger-Pratt (October 7, 2019), City (October 7, 2019),

Environmental Protection Agency ("EPA") (October 21, 2019), Virginia Department of Health

("VDH") (April 23, 2021), Center for Disease Control ("CDC") (September 28, 2020), and

Commonwealth of Virginia Division of Consolidated Laboratory Services (April 21, 2021).  On

September 29, 2020, Plaintiff held a phone conference with Dr. Karl Markiewicz, Department of

Health & Human Services' (hereinafter "DHH") Agency for Toxic Substances and Disease

Registry, (hereinafter "ATSDR") to discuss EPA's and ATSDR's involvement with the asbestos

release at the residential complex called Hunting Point located across the street from Foulger-

Pratt's The Thornton. Foulger-Pratt's testing results disclosing VOCs and HAPs was also disclosed and discussed during the conference call. Plaintiff and the remaining aforementioned entities did not have a substantive discussion about the hazardous substances present at The Thornton. On November 29, 2021, prior to filing this Complaint, Plaintiff mailed notices of intent to sue via certified mail return receipt to the following parties: Foulger-Pratt entities, City's departments, RCG&A, City's counsel, Virginia Department of Health, Virginia Attorney General, Virginia Governor, EPA's Administrator, EPA's Region representative, United States Attorney General, and the aforementioned parties' registered agents. Plaintiff will file leave of court to amend complaint upon the 60-day deadline to cure the record.

## **PLAINTIFF**

25.    Plaintiff is an adult citizen of the State of Virginia and Eastern District of Fairfax County. Plaintiff is an attorney licensed to practice in Massachusetts and the District of Columbia. Plaintiff currently has temporary housing and periodically travels to her sister's residency located at 4730 Brookfield Court, Cincinnati, OH 45244. Plaintiff has a 3-month temporary postal mailbox located at 200 N Washington Street, Unit 320547, Alexandria, VA 22320. On June 18, 2019, Plaintiff signed a 12-month lease agreement with Foulger-Pratt at The Thornton. On August 8, 2019, Plaintiff commenced the lease by moving into Apartment No. N-210 (hereinafter "N-210"). Plaintiff was a tenant at Foulger-Pratt's The Thornton from August 2019 to October 2020. Plaintiff resided at N-210 from August 2019 to December 2019. Plaintiff resided at Apartment No. N-120 (hereinafter "N-120") from December 2019 to October 2020. Plaintiff was harmed by exposures of HAPs inside of N-210 that continued to harm Plaintiff until December 7, 2019, when Plaintiff transferred to N-120.

**COMPLAINT**

## DEFENDANTS

26.    **Defendant Foulger-Pratt**'s parent company, Foulger-Pratt Companies, LLC,

purports to be a distinguished real estate development firm from acquisition to development,

construction to asset management, the firm has developed more than 13.7 million square feet of

commercial office, retail space, and multifamily residential projects.  Foulger-Pratt Companies,

LLC is a Maryland limited liability company principally located in Potomac, Maryland.

Foulger-Pratt Companies, LLC has an inactive registration authorizing business in Virginia.

Foulger-Pratt Foulger-Pratt Companies is the sole parent company of the following Foulger-Pratt

subsidiaries:  Foulger-Pratt, LLC (hereinafter "FP"); Foulger-Pratt Development, LLC

(hereinafter "FP-Development"); Foulger-Pratt Residential, LLC (hereinafter "FP-Residential");

Foulger-Pratt Contracting, LLC (hereinafter "FP Contracting"); Foulger-Pratt Management, LLC

(hereinafter "FP-Management"); Thornton Residential Holdings Title Holder, LLC (hereinafter

"FP-TRHTH"); Thornton Residential Holdings, LLC (sole member) (hereinafter "FP-TRH"); FP

Alexandria, LLC (sole manager) (hereinafter "FP-Alexandria"); and SREIT Thornton at

Alexandria, LLC (hereinafter "FP-SREIT").   Foulger-Pratt purchased and demolished Hunting

Terrace to develop and construct The Thornton.  Foulger-Pratt owns and manages The Thornton,

which is in Alexandria County at the following physical addresses in Historic Old Town: 750

Thornton Way, Alexandria, VA 22314 and 751 Thornton Way, Alexandria, VA 22314.  The

registered agent is Cogency Global Inc. located at 1519 York Road, Lutherville, MD 31093.

27.    **Defendant FP** is a Maryland limited liability company principally located in

Potomac, Maryland.  FP's parent company is Foulger-Pratt Companies, LLC.  FP has an active

registration authorizing business transactions in Virginia.  FP conducted business in Alexandria

County, Virginia at The Thornton. The registered agent is Cogency Global, Inc. located at 250 Browns Hill Court, Midlothian, VA 23114.

28. **Defendant FP-Contracting** is a Maryland limited liability company principally located in Potomac, Maryland. FP-Contracting's parent company is Foulger-Pratt Companies, LLC. FP-Contracting has an active registration authorizing business transactions in Virginia. FP conducted business in Alexandria County, Virginia at The Thornton. FP-Contracting handled the negotiations for real estate acquisitions and projects with City to include financing The Thornton. The registered agent is Cogency Global, Inc. located at 250 Browns Hill Court, Midlothian, VA 23114.

29. **Defendant FP-Development** is Maryland limited liability company principally located in Potomac, Maryland. FP-Development's parent company is Foulger-Pratt Companies, LLC. FP-Development has an active registration authorizing business transactions in Virginia. FP-Development conducted business in Alexandria County, Virginia at The Thornton. Specifically, FD-Development handled the demolition of Hunting Terrace, planning and zoning for The Thornton to include building permits, preservation of brick kilns, excavation and construction of The Thornton. The registered agent is Cogency Global, Inc. located at 250 Browns Hill Court, Midlothian, VA 23114.

30. **Defendant FP-Residential** is Maryland limited liability company principally located in Potomac, Maryland. FP-Residential's parent company is Foulger-Pratt Companies, LLC. FP-Residential has an active registration authorizing business transactions in Virginia. FP-Residential conducted business in Alexandria County, Virginia at The Thornton. Specifically, FD-Residential handled the management and leasing of The Thornton. The

registered agent is Cogency Global, Inc. located at 250 Browns Hill Court, Midlothian, VA 23114.

31.     **Defendant FP-Management** is Maryland limited liability company principally located in Potomac, Maryland. FP-Management's parent company is Foulger-Pratt Companies, LLC. FP-Management has an active registration authorizing business transactions in Virginia. FP-Management conducted business in Alexandria County, Virginia at The Thornton. The registered agent is Cogency Global, Inc. located at 250 Browns Hill Court, Midlothian, VA 23114.

32.     **Defendant FP-TRHTH** is a Delaware limited liability company principally located in Potomac, Maryland. FP-TRHTH's parent company is Foulger-Pratt Companies, LLC. FP-TRHTH has an active registration authorizing business transactions in Virginia. FP-TRHTH conducted business in Alexandria County, Virginia. The registered agent is Cogency Global, Inc. located at 250 Browns Hill Court, Midlothian, VA 23114.

33.     **Defendant FP-TRH** is a Delaware limited liability company principally located in Potomac, Maryland. FP-TRH parent company is Foulger-Pratt Companies, LLC. FP-TRH is not registered to conduct business in Virginia. FP-TRH conducted business in Alexandria County, Virginia because it is the sole manager of FP-TRHTH. The registered agent is Cogency Global, Inc. located at 858 New Burton Road, Ste. 201, Dover, DE 19904.

34.     **Defendant FP-Alexandria** is a Maryland limited liability company principally located in Potomac, Maryland. FP-Alexndria's parent company is Foulger-Pratt Companies, LLC. FP-Alexandria's has an active registration authorizing business transactions in Virginia. FP-Alexandria's conducted business in Alexandria County, Virginia at The Thornton. FP-

Alexandria was the sole manager of FP-TRHTH. The registered agent is Cogency Global, Inc. located at 250 Browns Hill Court, Midlothian, VA 23114.

35.    **Defendant FP-SREIT** is a Delaware limited liability company with a principal place of business located at 1601 Washington Avenue, Ste. 800, Miami Beach, FL 33139. FP-SREIT is registered to transact business in Virginia. FP-SREIT's registered agent is CT Corporation System located at 4701 Cox Road, Ste. 285, Glen Allen, VA 23060., 1209 Orange Street, Wilmington, DE 19801. FP-SREIT was incorporated shortly following Plaintiff's exposure to toxic substances. On October 29, 2019, Foulger-Pratt distributed a notice to The Thornton's tenants that explained how the lease agreements were sold, transferred, and assigned to FP-SREIT but FP-Residential would continue to manage the property. FP-SREIT has no employees and depends on Starwood REIT Advisors, LLC (hereinafter FP-SREIT-Advisors") to perform operations.

36.    **Defendant City** includes the departments that were involved with the bidding, planning, constructing, developing, and managing of The Thornton. The following departments were primary parties: City-Code, City-AA, City's Board of Architects (hereinafter "City-BAR"), City's Office and Environmental Quality (hereinafter "City-OEQ"), and City's Housing Authority (hereinafter "City-Housing") enforced local regulations and assisted Foulger-Pratt with regulatory compliance of local, state, and federal laws. City also assisted Foulger-Pratt entities in acquiring, planning, and constructing The Thornton. In addition, City oversees the affordable housing program.

37.    **Defendant City-Code** handled the master planning, building planning, building permits, demolition permits, and zoning of The Thornton. Gregg Fields (hereinafter "City-Code-Fields") is the City-Code's director.

38.    **Defendant City-BAR** reviewed and approved Foulger-Pratt's architectural designs. City-BAR approves all architectural and engineering designs to comply with City's strict architectural requirements for structures located specifically in historic old town Alexandria.

39.    **Defendant City-AA** handled the preservation of brick kilns at The Thornton. Specifically, Garrett Fesler, Ph.D. (hereinafter "City-AA-Fesler" was the archeologist assigned to work with Foulger-Pratt. Francine Bromberg (hereinafter "City-AA-Bromberg") was the Director of City-AA and was also involved in the archaeological monitoring of Hunting Terrace brick kilns' preservation in 2016.

40.    **Defendant City-OEQ** was responsible for maintaining the environmental programs for Alexandria, Virginia. City-OEQ regulated asbestos certifications and verification for constrictor's ASB designations.

41.    **Defenant City-Housing oversees the affordable housing programs. Melodie Seau is the City-Housing's director.**

42.    **Defendant RCG&A** is a cultural resource management group with 30 years of experience in preservation. RCG&A assisted City and Foulger-Pratt with preserving brick kilns during excavation and construction of The Thornton. RCG&A-Child was the lead inspector.

43.    **Defendant CEI** performed the initial asbestos survey at 1199 S. Washington Street in Alexandria, VA where Hunting Terrace was being demolished and The Thornton was built. CEI provided the Asbestos Inspection and Abatement Validation forms. Jeffrey C. Ogle aka Jeffery C. Ogle (hereinafter "CEI-Ogle") and Loren C. Barrett aka Loren C. Barret (hereinafter "CEI-Barret") performed visual inspections for asbestos clearance certification.

44.    **Defendant ESI** conducted Plaintiff's inspection on November 6, 2019.  Jeff Thorne (hereinafter "ESI Thorne") was an asbestos specialist that performed the inspection.

45.    **Defendant PR** was listed on Foulger-Pratt's building permit as the environmental contractor.

46.    **Defendant AR** is a Maryland limited liability company with a trade name registered by Robert J. Roberton for Apartment Restorers, which is not registered with AR's business registration license in Virginia.  AR's principal place of business is 14660 Rothgeb Drive #102, Rockville, MD 20850.  AR's registered agent is Corporation Service Company located at 100 Shockoe Slip, Fl 2, Richmond, VA 23219.

47.    **Defendant Manosalva** performed services in his sole capacity because TAM's Virginia registration license was inactive at the time services were rendered at The Thornton in Alexandria, Virginia.  The principal place of business and registered agent is located at 8711 Victoria Road, Springfield, VA 22151.

48.    **Defendant TAM has** a principal place of business located at 8711 Victoria Road, Springfield, VA 22151.  TAM has an inactive business registration license in Virginia and was inactive at the time it rendered services to Plaintiff's former apartment N-120 at The Thornton.  Upon information and belief, Tomas Manosalva owns TAM.   The registered agent is located at 8711 Victoria Road, Springfield, VA 22151.

49.    **Defendant Kurman** has a principal place of business located at 8000 Towers Crescent Drive, Suite 1400, Vienna, VA 22182.  Kurman is the law firm that represents Foulger-Pratt for debt collections. Attorney-at-Law Crystal Kramer (hereinafter "Kurman-Kramer") offered Plaintiff a settlement after a lengthy exchange involving fraudulent debt and damages, which Plaintiff denied.

50.     **Defendant Warfield** was the first entity to pursue Foulger-Pratt's fraudulent debt collections.  Hunter Warfield continues to contact Plaintiff by mail recklessly pursuing fraudulent debt.

## REGULATORY

## I.     CLEAN AIR ACT

### A.     Federal, State, & Local Guidelines

51.     The CAA regulates air emissions and authorizes the EPA to establish National Ambient Air Quality Standards (hereinafter "NAAQS") to protect public health and the environment.[2]  In 1977, the CAA amendments established rigorous requirements to reduce emissions that fail to meet the National Ambient Air Quality Standards (hereinafter "NAAQS").[3] Specifically, the Prevention of Significant Deterioration (hereinafter "PSD") was established to maintain areas that met NAAQs to avoid deterioration in air quality above an established baseline level.[4]  In 1990, the CAA amendments expanded to address problems such as: acid rain, ground-level ozone, stratospheric ozone depletion, visibility, and air toxics.  According to the EPA, the following six (6) contaminants are the most common air pollutants that can harm someone's health and the environment:

| AIR POLLUTANTS |
| --- |
| Nitrogen Dioxide (NOx) |
| Sulfur Dioxide (SO2) |
| Particulate Matter (PM10 and PM2.5) |
| Carbon Monoxide (CO) |
| Ozone (O3) |
| Lead (Pb) |

Table 1: EPA's Most Common Air Pollutants

[2] 42 U.S.C. 7401 et seq.; Bureau of Ocean Energy Management. *Air Quality Act (1967) Or The Clean Air Act (CAA)*, United States Department of Interior, https://www.boem.gov/air-quality-act-1967-or-clean-air-act-caa
[3] *Id.*
[4] *Id.*

52.    The CAA "calls for state, local, federal, and tribal governments to implement the

Act in partnership to reduce pollution."[5] CAA's Section 110 requires each state to submit a state

implementation plan (hereinafter "SIP") to "demonstrate how the state will maintain air pollution

at the reduced levels" at or below NAAQS.[6] The EPA lists the following roles in the table

below, which are dependent on the nature of the air pollution problem in the table below:

| AIR POLLUTANT | RELATIONSHIP | ESTABLISHED ENFORCEMENT |
|---|---|---|
| Common Pollutants | State-EPA Partnership | EPA establishes national standards to protect the public with an "adequate margin of safety" and the states implement plans to meet standards. |
| Air Toxics | National Standards | EPA issues standards and states have the option to adopt a program for partial or complete delegation of EPA authority to implement and enforce standards. |
| Acid Rain | Federal Program | EPA issued implementing rules, track the emissions allowances, and monitor compliance. |
| Ozone Layer Protection | National Requirement | EPA issues and enforces rules to phase out production of ozone-depleting chemicals and ensure proper handling of chemicals. |
| Regional Haze | State Plan | EPA asked states to adopt enforceable plans to reduce air pollutants that damage visibility in national parks and other protected areas with EPAS's guidance and review to ensure compliance. |
| Operating Permits | State Typically Lead | States in most areas issue permits with CAA requirements for major stationary sources and certain other sources subject to federal standards to assure compliance. |
| Tribal Governments | Discretionary | Tribe governments can administer CAA programs and EPA must approve the tribe's eligibility to implement the program and subsequently approve the program. Otherwise, EPA implements the law in Indian country. |

Table 2: EPA & State Enforcement

Virginia's State Air Pollution Control Board enforces the Regulation for the Control and

Abatement of Air Pollution to regulate the control and abatement of air pollution.[7] EPA's

---

[5] United States Environmental Protection Agency. *Clean Air Act Overview*, https://www.epa.gov/clean-air-act-overview/government-partnerships-reduce-air-pollution (Accessed 21 November 2021).
[6] Sabasteanski, Karen. *State Implementation Plan*, *Air Quality Planning*, DEQ.VIRGINIA.GOV, Virginia Department of Environmental Equality, https://www.deq.virginia.gov/air/air-quality-planning/state-implementation-plan (Accessed 6 December 2021).
[7] 9VACS-60-60; *see* 40 CFR 61.140 through 40 CFR 61.157 (Subpart M- Asbestos); *see also* 40 CFR 61.300 through 40 CFR 61.306 (Subpart BB – Benzene Emissions From Benzene Transfer Operations); 40 CFR 61.340 through 40 CFR 61.358 (Subpart FF – Benzene Waste Operations). EPA retains authority over Appendix B – Test Methods.

**COMPLAINT**

NESHAP "as promulgated in 40 CFR Part 61 and designated in 9VACS-60-70 are, unless indicated otherwise, incorporated by reference into the regulations of the board as amended by the word or phrase substitutions given in 9VACS-60-80.[8] Similarly, the Virginia Department of Environmental Quality (hereinafter "VDEQ") "ensures Virginia's air quality meets established standards by limiting how much certain pollutants can be emitted into the air [. . .] by managing a pollutant emissions inventory program and monitoring air quality throughout the state."[9] Violators who fail to comply with environmental laws may voluntarily agree to perform EPA's SEP, which "must have a strong "nexus," or connection, to the violations being resolved, and advance the goals of the statute from which the violations stemmed."[10] Although the EPA must reject a SEP, it "may not be directed, controlled, or managed by EPA."[11]

53.    The CAA's NESHAP (40 CFR Part 61, Subpart M.) and Va. Code Section 36-99.7 (hereinafter "Va. Code § 36-99.7") regulate asbestos-containing material during demolition and renovation. The EPA's Information for Owners and Managers of Buildings that Contain Asbestos (hereinafter "EPA's Asbestos Information") explains how NESHAP requires "the owner of the building or the operator to notify the appropriate state agency before any renovations of buildings that could contain a certain threshold amount of asbestos or asbestos-containing materials."[12] EPA's Asbestos Information also explains how the Asbestos Hazard Emergency Response Act (hereinafter "AHERA")'s Model Accreditation Map (hereinafter "MAP")" requires that asbestos professionals (including any worker, contractor or supervisor,

---

[8] *Id.*
[9] Virginia Department of Environmental Equality. *Air Quality Planning*, Commonwealth of Virginia, https://www.deq.virginia.gov/air/air-quality-planning/state-implementation-plan (Accessed 6 December 2021).
[10] United States Environmental Protection Agency, *Supplemental Environmental Projects*. Enforcement, https://www.epa.gov/enforcement/supplemental-environmental-projects-seps (Accessed 6 December 2021).
[11] *Id.*
[12] United States Environmental Protection Agency. *Information for Owners and Managers of Buildings that Contain Asbestos*, https://www.epa.gov/asbestos/information-owners-and-managers-buildings-contain-asbestos (Accessed 6 December 2021).

**COMPLAINT**

inspector, management planner, or project designer) working with asbestos-containing material in a school, public or commercial building be accredited under a training program at least as stringent as the EPA" MAP."[13]  In Virginia, building permits may not be issued until no asbestos-containing materials are found or that an appropriate response action was undertaken by a licensed asbestos contractor.[14]  The site of asbestos "shall not be reoccupied until the building official receives certification from the building official from the owner that the response actions have been completed and final clearance has been measured."[15]

      **B.**    **Asbestos Exposure & Health Effects**

    54.    According to the Agency for Toxic Substance and Disease Registry (hereinafter "ATSDR"), exposure may consist of "breathing tiny asbestos fibers in the air [. . .] from natural deposits of asbestos in the earth or from past or current commercial products that contain the minerals [. . .] [or] when something disturbs them in soil, rock, or older products" such as:

| ASBESTOS EXPOSURE BY DISTURBANCE |
| --- |
| Weather or erosion of natural deposits of asbestos at the ground surface or old asbestos-containing products |
| Crushing rock with natural deposits of asbestos |
| Handling, cutting, or crushing old asbestos-containing products like during building renovation or demolition projects |
| Disturbing soil contaminated by natural surface deposits or old asbestos-containing products during recreational or outdoor activities. |
| Handling or disturbing consumer products contaminated with asbestos (such as vermiculite or talc) |
| Gardening in soil contaminated by asbestos from natural deposits or commercial products |
| Cleaning or other household activities that might stir up dust containing asbestos from natural deposits or products |

Table 3: ATSDR's Examples of Asbestos Releases by Disturbance[16]

---

[13] *Id.*
[14] Va. Code § 36-99.7(A) – (B)
[15] Va. Code § 36-99.7(D)
[16] Asbestos Exposure and Reducing Exposure. Asbestos and Your Health, ATSDR.CDC.GOV, Agency for Toxic Substances and Disease Registry, https://www.atsdr.cdc.gov/asbestos/asbestos_exposure.html (Accessed 6 December 2021).

55.     According to ATSDR, inhalation is the most common sources of exposure, but asbestos can be ingested or enter the skin though these exposures rarely cause health effects unless exposed to large amounts.[17]  According to the Center for Disease Control (hereinafter "CDC"), asbestos can cause non-cancerous diseases like asbestosis and pleural disease and can also increase the risk of developing the following cancers: lung cancer, mesothelioma, cancer of the pharynx, cancer of the stomach, and cancer of the colorectum. [18]  After exposure to asbestos, removal from the lungs is impossible so "[p]reventing further harm to the respiratory system can lower the chances of disease developing or slow down progress of an existing disease [by] [a]voiding further asbestos exposure."[19]

**C.     VOC Exposures & Health Effects**

56.     According to the American Lung Association (hereinafter "ALA"), VOCs are gases emitted in the air from products or processes, and some can react with other gases and form other air pollutants.[20]  The following complications may result from exposure to VOCs:

> Breathing VOCs can irritate the eyes, nose and throat, can cause difficulty breathing and nausea, and can damage the central nervous system as well as other organs.  Some VOCs can cause cancer. Not all VOCs have all these health effects, though many have several.[21]

The following are common VOCs: benzene, ethylene glycol, formaldehyde, ethanol, methylene chloride, tetrachlorethylene, toluene, xylene, 1-3 butadiene, acetone, butanal, carbon disulfide, dichlorobenzene, terrones, carbon tetrachloride, polyclad aromatic hydrocarbons.

---

[17] *Id.*
[18] "Health Effects of Asbestos." Asbestos and Your Health, ATSDR.CDC.GOV, Agency for Toxic Substances and Disease Registry, https://www.atsdr.cdc.gov/asbestos/health_effects_asbestos.html (Accessed 6 December 2021); Section 104(i)(1)(directs Administrator of ATSDR to effectuate and implement the health related authorities of the statute); Section 104(i)(3)(directs Administrator of ATSDR to prepare a toxicological profile).
[19] *Id.*
[20] "Volatile Organic Compounds." LUNG.ORG, American Lung Association, https://www.lung.org/clean-air/at-home/indoor-air-pollutants/volatile-organic-compounds (Accessed 6 December 2021).
[21] *Id.*

**D.     Respirable Crystalline Silica Exposures and Health Effects**

57.     The Comprehensive Environmental Response Compensation, and Liability Act of

1980 (hereinafter "CERCLA"), as amended (CERCLA or Superfund) Section 104(i)(1) requires

the ATSDR's Administrator to prepare "toxicological profiles for hazardous substances most

commonly found at facilities on the CERCLA National Priorities List (NPL) and that pose the

most significant potential threat to human health, as determined by ATSDR and the EPA."[22]  The

following health effects of inhaled crystalline silica were reports by workers with prolonged

period of time in silica industries:

> Health effects that have been associated with occupational
> exposure to c-silica are silicosis (a progressive, fibrotic lung
> disease), chronic obstructive pulmonary disease (COPD), lung
> cancer, renal toxicity, increased risk of tuberculosis, and
> autoimmune disease. Of these, silicosis and lung cancer pose the
> greatest concern to human health. Under most exposure conditions,
> silicosis occurs from chronic exposure. However, intermediate-
> duration exposure to high levels (not defined) of e-silica has been
> associated with the development of silicosis, although this is not
> common.   It is important to note that these health outcomes have
> not been associated with exposures to ambient air levels of e-silica
> [. . .] The Department of Health and Human Services classified e-
> silica (respirable size) as a Group 1 (definite) human lung
> carcinogen.[23]

The Occupational Safety and Health Act of 1970 (hereinafter "OSH Act") requires employers to

comply with safety and health standards regulated by OSHA and OSHA-approved state laws.[24]

On June 23, 2018, OSHA began enforcing the Respirable Crystalline Silica for the general

industry and maritime employers to regulate occupational exposures to respirable crystalline

---

[22] United States Department of Health and Human Services, Agency for Toxic Substances and Disease Registry (2019). *Toxicological Profile for Silica* (Section 5(a)(1)).  Retrieved from
https://www.osha.gov/sites/default/files/publications/OSHA3902.pdf.
[23] *Id.* at 3-8.
[24] United States Department of Labor Occupational Safety and Health Administration, *Silica, Crystalline* (Standard 1926. 1153). Retrieved from https://www.osha.gov/silica-crystalline/general-industry-maritime.

**COMPLAINT**

silica in construction work.[25]  On September 23, 2017, OSHA began enforcing requirements on

construction employers.[26]  OSHA Specifically, OSH Act's General Duty Clause, Section 5(a)(1),

requires employers to provide their workers with a workplace free from recognized hazards that

are causing or likely to cause death or serious physical harm.[27]  According to OSHA's Small

Entity Compliance Guide for the Respirable Crystalline Silica Standard for Construction

(hereinafter "OSHA-Silica Report"), employers should comply with advisory requirements to

establish a Written Exposure Control Plan, collect Air Monitoring Data, and perform Medical

Surveillance to perform Air Monitoring to minimize dust emissions.[28]  OSHA's Respirable

Crystalline Silica Standard for Construction Fact Sheet (hereinafter "OSHA-Silica Fact Sheet")

describes respirable crystalline silica as the following:

> Crystalline silica is a common mineral that is found in construction
> materials such as sand, stone, concrete, brick, and mortar. When
> workers cut, grind, drill, or crush materials that contain crystalline
> silica, very small dust particles are created. These tiny particles
> (known as "respirable" particles) can travel deep into workers'
> lungs and cause silicosis, an incurable and sometimes deadly lung
> disease. Respirable crystalline silica also causes lung cancer, other
> potentially debilitating respiratory diseases such as chronic
> obstructive pulmonary disease, and kidney disease. In most cases,
> these diseases occur after years of exposure to respirable
> crystalline silica.[29]

---

[25] 29 CFR 1926.1153
[26] United States Department of Labor Occupational Safety and Health Administration, *Silica, Crystalline
Construction* (Standard 1926. 1153) Retrieve from https://www.osha.gov/silica-crystalline/construction.
[27] *Supra* at 23.
[28] "Small Entity Compliance Guide for the Respirable Crystalline Silica Standard for Construction." OSHA.GOV,
Occupational Safety and Health Administration,
https://www.osha.gov/sites/default/files/publications/OSHA3902.pdf (Accessed 6 December 2021).
[29] "OSHA's Respirable Crystalline Silica Standard for Construction." OSHAFactSheet, OSHA.GOV, Occupational
Safety and Health Administration, https://www.osha.gov/sites/default/files/publications/OSHA3681.pdf (Accessed 6
December 2021).

According to OSHA-Silica Report, employers should comply with advisory requirements to establish a Written Exposure Control Plan, collect Air Monitoring Data, and perform Medical Surveillance to perform Air Monitoring to minimize dust emissions.[30]

## II.     TOXIC SUBSTANCES AND CONTROL ACT

### A.     Regulatory Guidelines

58.     Similarly, TSCA establishes EPA's authority to require reporting, record-keeping, and testing requirements, and restrictions relating to chemical substances/mixtures.[31] In addition, TSCA regulations include criminal provisions for "knowingly and willfully" violating provisions as listed below:

> **A person knowingly and willingly violates any provision of section 2614 or 2689, knew at the time of the violation that the violation places another person in imminent danger of death or serious bodily injury.** Individuals face a maximum penalty of not more than $250,000 and 15 years in prison, corporations face a maximum $1,000,000 fine per violation (organizations addressed in 2615(b)(2)(B)).[32]

> A person knowingly and willingly fails or refuses to comply with a [33]regulation order, or inspection under 15 U.S.C. 2603-2606, 2610 (Control of Toxic Substances); 15 U.S.C. 2681-2689 (Lead Exposure Reduction) regarding a substance regulated under TSCA or AHERA. Individuals face 1 year in prison and/or up to $50,000 per day violation.[34]

> A person subject to record keeping, reporting, or access for copying requirement under TSCA (15 U.S.C 2601-2692) knowingly and willingly fails or refuses to comply with the requirement faces 1 year in prison and/or up to $50,000 per day violation.[35]

---

[30] *Supra* at 20.
[31] 15 U.S.C. § 2601 (et seq. 1976)
[32] 15 U.S.C. 2615(b)(2)(A)
[33] 15 U.S.C. 2615(b); 40 C.F.R. 700 – 766
[34] 15 U.S.C. 2615(b); 40 C.F.R. 700 – 766
[35] 15 U.S.C. 2615(b)

59.    On December 12, 2016, EPA published the Federal Register's final rule to reduce emissions from composite wood with the Formaldehyde Standards for Composite Wood Products Act of 2010 (hereinafter "Formaldehyde Standards"), which added Title VI to the TSCA.[36] The Final Rule was effective February 10, 2017, and the effective date was delayed to May 22, 2017.  Specifically, the Formaldehyde Standards applies to the following:

> Hardwood plywood, medium-density fiberboard, and particleboard, and finished goods containing these products, that are sold, supplied, offered for sale, or manufactured (including imported) in the United States.  This final rule includes provisions relating to, among other things, laminated products, products made with no-added formaldehyde resins or ultra-low emitting formaldehyde resins, testing requirements, product labeling, chain of custody documentation and other recordkeeping requirements, enforcement, import certification, and product inventory sell-through provisions, including a product stockpiling prohibition. This final rule establishes a third-party certification program for hardwood plywood, medium-density fiberboard, and particleboard and includes procedures for the accreditation of third-party certifiers and general requirements for accreditation bodies and third-party certifiers.[37]

Upon information and belief, Foulger-Pratt, TAM, and Manosalva supply building materials.

60.    In December 2019, the EPA designated formaldehyde as one of twenty high-priority chemicals undergoing risk evaluation under the TSCA to fulfill its requirement per Section 6(b)(4)(D) and described in 40 CFR 702.41(c)(8).  Pursuant to Section 5, TSCA has the authority to issue Significant New Use Rules ("SNUR") when it identifies a new usage that could result in exposures to, or releases of, a substance of concern.  TSCA should consider issuing SNUR for City-AA's usage at the site to preserve City's brick kilns.

B.    Formaldehyde Exposure Guidelines

---

[36] 15 U.S.C. § 2697; 40 CFR Part 770
[37] Formaldehyde Emission Standards for Composite Wood Products 81 Fed. Reg. 89674 (December 12, 2016) (to be codified at 40 C. F. R. Part 770).

**COMPLAINT**

61.    According to the American Cancer Society, formaldehyde is a potent, colorless gas commonly used in building materials and household products such as the following: "press-wood products, such as particleboard, plywood, and fiberwood; glues and adhesives; permanent-press fabrics; paper product coatings; and certain insulation materials" and used to make other chemicals.[38]  According to the US Consumer Product Safety Commission (hereinafter "CPSC"), urea-formaldehyde foam insulation (UFFI) causes the following complications:

> Many health complaints, including irritation of the eyes, nose, throat, and skin, headaches and shortness of breath, have been reported to CPSC over the last several years by consumers who have had UFFI in their homes. Less frequently reported symptoms include chest pain, diarrhea, nausea, fatigue, and sleep disturbance.
>
> Studies have shown that formaldehyde in liquid solution (and possibly formaldehyde gas) can, through repeated exposure, cause sensitization in certain individuals. When exposed to formaldehyde gas, sensitized individuals may exhibit allergic dermatitis or mild-to-severe asthmatic reactions.[39]

Although the primary source of exposure to formaldehyde is by inhaling it, it can still be absorbed through the skin and by ingesting foods or drinking liquids containing formaldehyde.[40]

**C.    Major Health Effects of Formaldehyde Exposure**

62.    According to the American Cancer Society (hereinafter "ACS"), causes the following health effects: watery eyes, burning sensations of the eyes, nose, and throat, coughing, wheezing, nausea, and skin irritation.[41]  ACS explained how exposure to formaldehyde has been shown to cause cancer in laboratory test animals and humans in the following studies:

> Several epidemiology studies of people exposed to formaldehyde in the workplace have reported a link between formaldehyde

---

[38] "Formaldehyde What is Formaldehyde?" CANCER.ORG, American Cancer Society, https://www.cancer.org/cancer/cancer-causes/formaldehyde.html (Accessed 23 November 2021).
[39] "CPSC Still Concerned About Formaldehyde Risks." CPSC.GOV, United States Consumer Product Safety Commission, https://www.cpsc.gov/Newsroom/News-Releases/1984/CPSC-Still-Concerned-About-Formaldehyde-Health-Risks (Accessed 6 December 2021).
[40] *Id.*
[41] *Supra* note 27.

> exposure and cancer of the nasopharynx (the uppermost part of the
> throat), but this outcome has not been observed in other studies.
> These studies looked at workers in occupational setting that use or
> make formaldehyde and formaldehyde resins, as well as at people
> who work as embalmers.[42]

Similar links between workplace exposure and cancer include cancer of the nasal sinuses and

leukemia, particularly myeloid leukemia.[43]  ASC compiled the following expert agencies

determination of cancer-causing potential: (1) National Toxicology Program ("NTP") – "known

to be a human carcinogen;" (2) International Agency for Research on Cancer ("IARC") –

"carcinogenic to humans" based on higher risks of nasopharyngeal cancer and leukemia;" (3)

EPA – "probable human carcinogen;" (4) National Cancer Institute ("NCI") – "may cause

leukemia, particularly myeloid leukemia, in humans."[44]

## III.     BRICK AND STRUCTURAL CLAY MANUFACTURING NESHAP

### A.     Regulatory Guidelines

63.    The EPA finalized NESHAP for Brick and Structural Clay Products ("BSCP")

manufacturing facilities.[45]  The most dispersed and injurious pollutants in the industrial areas are

emitted from brick kilns with the following pollutants: sulfur dioxide (SO2), nitrogen oxides

(NOx), carbon monoxide (CO), tropospheric ozone (O3), and heavy metals, and suspended

particulate matter.[46]

64.    Consistent with EPA's initial reasonable anticipation that the clay products

manufacturing industry would emit HAPs listed in Section 112(b) of the CAA, EPA should also

include non-producing brick and clay manufacturing sites.  Specifically addressing anticipated

emissions from brick manufacturing materials preserved underground.

---

[42] *Id.*
[43] Id.
[44] *Id.*
[45] 42 U.S.C. § 7401; 40 CFR Part 63 Subpart JJJJJ
[46] *Id.*

**COMPLAINT**

## FACTUAL BACKGROUND

### I. HISTORIC OLD TOWN ALEXANDRIA'S RESIDENCIES BUILT IN 1940

The following three (3) residential apartment complexes were located at the City's historic old town Alexandria near the Potomac River: (1) Hunting Terrace, (2) Hunting Towers, and (3) Hunting Point. All three (3) complexes contained asbestos. The EPA only inspected Hunting Point for an asbestos release.

### A.    Hunting Terrace Apartment Complex

65.      In 1943, the Hunting Terrace apartment complex was constructed in Old Town Alexandria located at S. Alfred Street near the Potomac River on a historical site where brick kilns were preserved in the ground during excavation. William H. Harris was the architect for Hunting Terrace, which initially had eight (8) buildings garden-style units.

66.      VDOT demolished three (3) apartment buildings that contained asbestos materials during the Woodrow Wilson Bridge Project to construct the sound barrier. After the completion of the bridge, the remaining five (5) buildings were purchased by IDI and Kay Management for $8 million. According to City-Code's public records, the remaining five (5) buildings contained asbestos that Foulger-Pratt was responsible for abating.

67.      On March 22, 2016, a blog called Jaybird's Jottings by Jay Roberts explained how Hunting Terrace was the first 20th century structure built at the City's southern edge prior to the Woodrow Wilson Bridge, the Beltway, and the residential units across the street. [47]   The article also commented on the demolition of Hunting Terrace's remaining five (5) buildings by Foulger-Pratt and captured an image of the partially demolished buildings surrounded by a small blue fence.

---

[47] Robets, Jay. *New Residential on S. Washington Street,* Typepad, Jay.Typepad.com

**COMPLAINT**

68.     Ardith Campbell Dentzer (hereinafter "Hunting Tenants Association – Dentzer") was the President of Hunting Towers and Hunting Terrace Tenants Association (hereinafter "Hunting Tenants Association").  Upon information and belief, Hunting Tenants Association – Dentzer spoke publicly about the following controversies: VDOT ownership, VDOT's neglect, VDOT considered buyouts, asbestos presence, accumulated dust, structural defects, City's involvement, and construction nuisance.

69.     Hunting Terrace housed low-income tenants who were upset when Foulger-Pratt acquired Hunting Terrace fearing their homes would be replaced with expensive and lavish complexes that they could not afford.  Initially, City and Foulger-Pratt appeared genuinely interested in providing brand new apartments and offering lower rents to the affordable housing program.  Upon information and belief, Foulger-Pratt was not interested in making anymore sacrifices for the good cause.  The Thornton apartment complex replaced the Hunting Terrace apartment complex no longer located on S Alfred Street, now located on S. Washington Street.

**B.     Hunting Towers Apartment Complex**

70.     In 1947, the Hunting Towers apartment complex was constructed located across the street from Hunting Terrace.  William H. Harris was also the architect for Hunting Towers.  IDI Group and Kay Management also owned and purchased Hunting Towers from VDOT.  Hunting Tower's residents were exposed to asbestos during the Woodrow Wilson Bridge Project.  The residents tried all the following to no avail: (1) publicly protesting to the City to no avail; (2) submitting complaints to the Hunting Tenants Association; and (3) terminating residential leases to relocate.  An article by Connection Newspapers described VDOT's removal of the brick façade that contained asbestos as the following:

> The brick façade must be removed first and hauled away because
> there is "non-regulated asbestos" around the windows and between

> the bricks. "This was used as sealant," [Reed Wilson, the
> Woodrow Wilson Bridge Expansion Project Coordinator for the
> City, explained]. These bricks must be hauled away and disposed
> of properly. They are going to be taken to somewhere in the
> Tidewater region. [Hunting Towers Demolition Postponed]

The article also disclosed the resident's complaints about the dust and debris from the demolition

via statements from Hunting Tenants Association – Dentzer who explained the following:

> I have asked VDOT to consider getting weather stripping for all of
> the widows [. . .] These buildings are very old and we do not have
> double-paned windows. There are cracks and dust is bound to get
> into our apartments. [Hunting Towers Demolition Postponed]

In addition, Hunting Tenants Association – Dentzer disclosed concern about the lack of available

roads to travel because both entryways via Route 1 and Washington Street were simultaneously

occupied by VDOT for construction.  Upon information and belief, City was aware of tenant's

exposures to HAPs and their dangerous living conditions but refrained from getting involved.

### 71.    Hunting Point Apartment Complex

72.    In 2014, the EPA submitted a Stop Work Order at the apartment complex across

the street called Hunting Point because of asbestos releases and requested assistance Department

of Health & Human Services' (hereinafter "DHH")'s ATSDR.  On May 6, 2015, a tenant filed a

lawsuit with the following charges: asbestos liability, product liability, and personal injury.[48]

The asbestos abating company pled guilty for improperly abating asbestos.  The owner, The

Laramar Group and Jeff Elowe, asserted he lacked knowledge of the asbestos on the site.  It is

unclear still what the asbestos contractor was hired to do.

## II.    FOULGER-PRATT'S OVERHAUL OF OLD TOWN ALEXANDRIA

### A.    Foulger-Pratt's Acquisition & Financing – Hunting Terrace Apartments

---

[48] Ray Elbert Parker v. Hunting Point Apartments, LLC, et al., 1:15-CV-00590 (2015).

34

**COMPLAINT**

73.     In December 2012, Foulger-Pratt acquired Hunting Terrace from IDI and Kay

Management for about $22.6 million.  Foulger-Pratt changed the name from Hunting Terrace to

West River Station.  In February 2016, on behalf of Foulger-Pratt, MAC Realty Advisors, LLC

("MAC") placed a $40 million joint venture equity investment from a private equity real estate

fund and a $93.5 million construction loan from a national lender to develop The Thornton with

439 units located in Historic Old Town Alexandria. The 2019 Annual Tax Assessment for The

Thornton was $132,935,000 (structure assessment value $110,495,000 and land assessment value

$22,440,000).

**B.      Foulger-Pratt's Demolition, Excavation, and Preservation – Alfred Street**

74.     Foulger-Pratt received several building permits that required asbestos inspections

and abatement certifications be completed prior to commencing demolition.  The City's

Department of Code Administration's Asbestos Inspection and Abatement Certification explains

the following:

> Effective July 1, 1993, the Virginia Uniform Statewide Building
> code requires all buildings constructed before 1985 that are to be
> renovated or demolished be inspected for the presence of asbestos-
> containing materials with appropriate response actions undertaken,
> subject to exemptions. The following form is to be completed by
> all applicants for Building Permits for renovations, alterations,
> repairs, or demolition. A completed form will contain one of the
> areas checked below and must be signed by the owner or
> authorized owner's agent to be a part of the building permit
> application. [City's Department of Code Administration's
> Asbestos Inspection and Abatement Certification Form]

Foulger-Pratt's applicable section identified "Asbestos-containing materials in the affected areas

of the above building to be renovated or demolished will be subject to appropriate response

actions in accordance with all applicable laws related to asbestos abatement in accordance with §

36-99.7."  Notably, the form states in bold at the bottom the following:

I further certify that **the abatement area will not be re-occupied until any required response actions have been completed and final clearances have been measured.** By requesting a final [inspection] for this permit, I certify that the final clearance levels for re-occupancy of the abatement area shall be 0.01 or fewer asbestos fibers per cubic centimeter if determined by Phase Contrast Microscopy analysis (PCM) or 70 or fewer structures per square millimeter if determined by Transmission Electron Microscopy analysis (TEM). [City's Department of Code Administration's Asbestos Inspection and Abatement Certification Form]

75.    Similarly, City-Code's Plan Submission Checklist Demolition Permit form identifies what is required in order to receive a permit. Requestors must check for asbestos and abate if detected with an asbestos licensed contractor approved by City-OEQ, and if asbestos is not detected then disclose the contractor's asbestos certification with a clearance letter to City-OEQ. Notably, the third requirement applies to both scenarios, which requires stopping upon discovery of asbestos. Specifically, if asbestos is discovered once demolition work begins, work must stop until a construction permit is obtained.

76.    On March 4, 2016, Foulger-Pratt's Agent Bryan C. Foulger filed the City's Department of Code Administration's Asbestos Affidavit for Building Permit # BLD2015-01834, Master Case # BLD2015-01162. The Asbestos Affidavit explained the following:

The affected portions of the building listed **have been inspected for the presence of asbestos by individual(s) licensed to perform such inspections** pursuant to the Code of Virginia that no asbestos-containing materials were found or that **appropriate response actions will be undertaken in accordance with the requirements of the Clean Air Act National Emission Standard for the Hazardous Air Pollutant (NESHAPS) (40 CFR Part 61, Subpart M).** [City's Department of Code Administration's Asbestos Affidavit Form]

Foulger-Pratt marked the following section of the form:

Asbestos was detected in the affected portions of the building and **response actions to abate any risk to human health have been**

taken in accordance with all applicable laws and regulations
regarding asbestos abatement
  o Proof of asbestos abatement via final clearance letter is
    required before a demolition permit is issued.
[City's Department of Code Administration's Asbestos Affidavit
Form]

Notably, the bottom of the form contained the following certification, "**I further certify that the abatement area will not be reoccupied until any required response actions have been completed** and final clearances have been measured and found to be within regulated tolerances."

77.    On March 10, 2016, the asbestos abatement was completed, which was after Foulger-Pratt's Asbestos Affidavit filing dated March 4, 2016, that stated "response actions to abate any risk to human health **have been taken** in accordance with all applicable laws and regulations regarding asbestos abatement."

78.    On March 11, 2016, CEI's completed Asbestos Inspection and Abatement Validation for the following three (3) building permits # BLD2015-01834 (1200 S Alfred Street), #BLD2015-01835 (1202 S Alfred Street), and # BLD2015-01790 (1204 S Alfred Street).  The building permit states, "5 Buildings-Asbestos Abatement Prior to Razing of Buildings."  It is unclear whether remaining permits exist for the following two (2) structures.  CEI's letters state the following:

[CEI] performed the initial asbestos survey throughout the
residential properties located at 1199 S. Washington Street in
Alexandria, Virginia on May 4 – 5, 2015, to identify accessible
suspected asbestos containing building materials (ACBMs). The
inspection was conducted by Jeffrey C. Ogle (EPA/VA-DPOR
Accredited Asbestos Inspector License # 3303003925 and Loren
C. Barrett (EPA/VA-DPOR Accredited Lead Inspector License #
3303003923). **The materials identified as ACBMs in the initial
survey were removed during the asbestos abatement
performed at 1200 South Alfred Street, in Alexandria,
Virginia. The abatement was completed on March 10, 2016.** A

37
**COMPLAINT**

> visual clearance inspection was performed by Loren C. Barrett
> (EPA/VA-DPOR Accredited Lead Inspector License #
> 3303003923 and VA Project Monitor License # 3309001750). **No
> known accessible asbestos containing materials remain in or on
> the building structure.** [CEI's Asbestos Inspection and
> Abatement Validation Letter]

The validation letter was signed by CEI'S Environmental Operations Manager Jeffrey C. Ogle.

Subsequently, City-Code conducted a site survey and final inspection – Foulger-Pratt passed.

79.     On March 24, 2016, an OSHA inspection (1134776.015 – Foulger Pratt) citation

was filed (Report ID 0355125) for safety and health with emphasis identified as "S:Asbestos" for

Foulger-Pratt's site listed as "1199 South Washington Treet" that was closed on March 24, 2016.

No public record exists disclosing any subsequent remedial actions were taken by any of the

named Defendants.  Notably, Foulger-Pratt failed to meet all the City-Code's building permit

conditions.  Specifically, Condition Code 2022 was not met for adequately wetting debris during

demolition and transporting activities to prevent the discharge of visible emission/dust from the

property.

**C.     Foulger-Pratt's Excavation & Preservation – 1199 Washington Street**

**80.**     The Brick Preservation Report explained how FP-Development's engineers and

architects worked with RGD&A and City-AA "to preserve as much of the remains of the

Alexandria Brick Company facility as possible."  Yet, Foulger-Pratt modified designs and

structural support where deep excavations existed and negligently covered them "with the layers

of clean sand borrowed from the same terrace that was cut to fill the site in the 1940s and that

may also have been sold by the brickworks as building sand."  It is unclear whether Foulger-Pratt

had the discretion or authority to relocate 1940s substances that historically contain asbestos

without any permit or emissions testing. City-AA's recklessly relied on RCG&A to monitor

Foulger-Pratt during the preservation process, which was via an on-call basis.  In addition to the

likelihood of an asbestos release already after the use of 1940s sand for fills, Foulger-Pratt struck

a brick kiln and sewage line established in the 1940s. The "kilns used coal for fuel; the black

sooty residue covered the working floor adjacent to the firebox openings and was found mixed

with coal ash and cinder that had accumulated in the bottoms of the flues." No public records of

subsequent permits or testing exist.

81.     Upon information and belief, Foulger-Pratt failed to request another permit for

asbestos abatement, never stopped to coordinate an assessment, and recklessly continued

construction without seeking subsequent permits and emissions testing to monitor the hazardous

pollutants on site. FOIA records contain emails between Foulger-Pratt and City-AA after

completing the preservation. Specifically, Foulger-Pratt expresses concern about whether they

resolved a mysterious matter and needed City's agreement in writing that Foulger-Pratt would

still receive their certificate of occupation. Notably, the asbestos demolition forms indicated no

one may occupy the structure without abatement. At no point did City seek a Special Use Permit

to grant access to the contaminated site nor allow the City-OEQ to intervene for emissions

testing.

## FACTUAL ALLEGATIONS

## THE FRAUDULENT SCHEME

*Conspiracy to Conceal Structural Defects at The Thornton*

82.     In May 2019, Plaintiff viewed an affordable housing unit at The Thornton.

Foulger-Pratt's Leasing Consultant named Shilpa Bhagat (hereinafter "FP-Bhagat") reassured

Plaintiff there were no issues with mold or insects. Subsequently, Plaintiff submitted the

application material to include paystubs, which exceeded the income restriction, but FP-Bhagat

accepted Plaintiff's most recent tax return to qualify for the program. Upon Plaintiff's requests

for a legal review of the lease agreement's liability waiver stating that tenants will not hold

Foulger-Pratt liable for any health problems resulting from mold and mildew, FP-Bhagat

explained the following on July 3, 2019:

> I have been informed by our legal team that we are not able to change the lease in any way, shape, or form. There has not been any incidents of mold in the apartment that you will be moving into. We do take mold and the issues that arise from it very seriously. Our maintenance team will inspect and repair any incidents in your apartment and all others, here at the Thornton. [FP-Bhagat's Email Dated 7/3/2019]

Plaintiff notified FP-Bhagat of the online review by a former tenant who complained about

structural defects that contributed to the accumulation of mold caused by the lack of adequate

space between the soil and building. Upon information and belief, FP-Bhagat retaliated in

response to Plaintiff's exposure of Foulger-Pratt's attempt to conceal structural defects and the

presence of harmful substances. Plaintiff refrained from further questioning about the premises

and signed the 12-month lease agreement for N-210. Unfortunately, N-210 was not available at

the time when Plaintiff signed the lease agreement. As a result, Plaintiff used a personal loan to

fund alternative temporary housing from May 2019 to August 2019 until the unit was available.

On August 8, 2019, Plaintiff received the keys to access N-210 and commenced the 12-month

lease agreement with Foulger-Pratt at The Thornton.

83.    Upon arrival, Plaintiff walked around the back of the building where N-210 was

located and took photographs of mulch covered in mold and gaps between wet mulch and the

exterior brick buildings. It was unclear whether the exposed metal was recently altered to form a

retaining wall. The online review appeared to be accurate based on this brief observation. A few

months later, Foulger-Pratt finally acknowledge there was a structural defect contributing to the

accumulation of moisture, but it was repaired prior to Plaintiff's arrival. Plaintiff was aware of

mold present because she performed a mold home test kit in each room for a day before moving her belongings inside the apartment. There were low spore counts in each room.

*Conspiracy to Conspiracy to Evade Litigation*

84.     On September 29, 2019, Plaintiff inhaled HAPs and apparently inhaled VOCs, HAPs, and asbestos then was left to suffer in N-210 for over 30-days while Foulger-Pratt and City-Seau refused testing and conspired to avoid exposing the historic mishandling of asbestos and HAPs in the City that caused Plaintiff's injuries. The City's environmental plans are a challenge and perhaps results from concealing ongoing hazardous releases rather than the recent HESHAP and standard changes. This site must be addressed immediately for everyone's sake.

85.     City-Seau never disclosed the history of asbestos to Plaintiff. Instead, City-Seau affirmed that Foulger-Pratt had done everything to resolve the matter. City-Seau found there was no risk or threat of harm with a history of asbestos, 1940s substances everywhere, and snoozing on brick kilns. City-Seau prematurely closed Plaintiff's complaint and prevented Plaintiff from receiving aide that may have prevented her pain and suffering. City-Seau suggested Plaintiff file a tenant assertion claim in Housing Court, but Plaintiff had nothing at the time to prove any harm. Plaintiff and the physicians never considered testing for asbestos because Plaintiff told physicians that The Thornton was a newly built structure that was not renovated. Plaintiff was in constant contact with FP-Partridge and provided ongoing details pertaining to Plaintiff's symptoms, and FP-Partridge's omissions shocks the conscious.

86.     Specifically, on Tuesday, October 29, 2019, at 11:33 AM, Plaintiff emailed FP-Partridge the following:

> Today, I had an environmental specialist inspect the air quality of my apartment N-210. I saw a doctor prior to returning to my apartment after your refusal to test my apartment for mold, and was prescribed four (4) medications to help combat the ongoing

symptoms that I previously disclosed to you about trouble breathing the air. I have converted my 1 bedroom into a studio to avoid overnight exposure to the air in the bedroom. The migraines, pressure, and fatigue persist even on medication. The sneezing, running nose, and coughing have suppressed with the medication. The inspector today found high/medium levels of carbon dioxide in each room but the highest was in the bathroom at 1184. He also found the bathroom and bedroom showed high moisture. He took an air sample for toxins in the bedroom. I should receive the results by Wednesday. Meanwhile, I am requesting a carbon monoxide alarm be installed inside my apartment. Thank you.

On October 31, 2019, at 4:19 PM, FP-Partridge responded to Plaintiff with the following email:

Thank you for the additional information. Due to my schedule, I do need some additional time to provide you with an update, but wanted to acknowledge my receipt of your message. I will have an update for you no later than Monday afternoon.

On Monday, November 4, 2019, at 4:03 PM, Plaintiff emailed FP-Partridge the following:

I am not sure what the update is regarding, but seems like you're still working on it. I am going to return to the doctor's this evening for more medication because I feel awful – joints ache with headache and now have dark stool. Is it possible to relocate to another apartment? I just need to rest so I can recover, and I can't keep paying to stay elsewhere for my body to recover to return for it to get worse. Last night was the worst. The longer I spend in the apartment, the harder it is for my body to combat the environment, and longer to recover while away. Please let me know if I can relocate to a safe apartment because I do not want to end the lease. I am 3 months in and want to enjoy the remaining time at The Thornton like everyone else get to experience.

On Monday, November 4, 2019, at 8:52 PM, FP-Partridge responded to Plaintiff with the following email:

Thank you for your patience. Since you raised the issue of "carbon dioxide" , we will need to gain access to have our own team investigate. We will install a sensor at that time. Please let us know if we can enter on Wednesday between 9:30 AM and 10:30 AM. You report that your environmental specialist found "high/medium" levels of carbon dioxide and "high" levels of moisture. These descriptive terms are not scientific and we would

> therefore appreciate copies of any reports or test results your have
> received so we can determine the appropriate response.
> Additionally, we would appreciate the contact information for this
> specialist so we can determine the type of studies performed.
> Finally, we regret the you have not been feeling well. If there was
> a diagnosis that was related to any issues with the apartment, we
> would appreciate receiving such information. To the extent you
> wish to vacate the apartment before the end of your lease term, we
> are willing to let you do so without penalty or usual notice.
> Unfortunately, I do not have a different apartment comparable to
> your apartment available for a transfer at this time. Please let me
> know if you have interest and I can have a lease termination
> agreement prepared for your review.

Plaintiff refrained from making any disclosures because it appeared Foulger-Pratt's requests were made in bad faith to simply discredit Plaintiff's limited findings and medical diagnosis.

87.    Plaintiff continued suffering in N-210 while Foulger-Pratt refused to test the apartment because FP-Partridge refused to approve a reasonable accommodation for Plaintiff's disability. As a child, Plaintiff had her tonsils surgically removed at a young. As a result, Plaintiff lacked the initial barrier that others with tonsils receive from their filtration and ability to collect particulates in the airway and flush them out of the body. Apparently, the remaining particulates lodged in Plaintiff's airway were very small but massive in volume because they were undetected on Plaintiff's chest x-ray and facial CT scan. FP-Partridge only requested medical information for injuries caused by the HAPs and neglected the duty to evaluate whether Plaintiff had a disability that required a reasonable accommodation. Instead, FP-Partridge explained that the multiple 1-bedroom units available to the public that had the same layout, are footage, and features as Plaintiff's apartment, were not available for Plaintiff's transfer since they were incompatible. Allegedly, the available units were incompatible because their addresses were not registered with City under the affordable housing program.

88.    Plaintiff's symptoms became unbearable and included the following: diarrhea, night sweats, swollen eyelids, hemiplegic migraines, tingling and numbness in limbs, body aches, and wheezing, from an extrathoracic upper airway obstruction.  Plaintiff tried to limit her movements to avoid further HAPs exposures to no avail.  Similarly, Plaintiff lived out of ziplock bags and zipped luggage to prevent further HAPs exposures.  Plaintiff stopped cooking and tried to eat before returning home to avoid ingesting HAPs.  Plaintiff wore N95 masks to prevent her nostrils from burning.  Upon Plaintiff's return from work each day, Plaintiff worried whether it would be her last.  It was pure torture.  Plaintiff greatly appreciated all the physicians' help to keep her airways open while inside of the apartment and medications to reduce some of the symptoms.  It allowed Plaintiff to tolerate the pain and suffering long enough to prevent Foulger-Pratt from further concealing the presence of HAPs and hopefully prevented someone else from being harmed like Plaintiff.

89.    While Foulger-Pratt delayed testing, Plaintiff noticed the small white crystals that scattered like dust and attached to objects like mold was multiplying rapidly.  These crystals were present since move-in day and were found in both apartments N-210 and N-120.  Upon information and belief, crystalline silica was the substance.  The small white crystals formed across the back of Plaintiff's 40-inch television that was in the living room against the wall between the living room and bedroom.  Initially, Plaintiff thought the growth appearance meant it was mold, but Plaintiff's blood lab work returned without any mold detected in her blood.  Currently, the crystals remain on Plaintiff's television, digital media players, and furniture and cause sneezing upon contact.  Similarly, all of Plaintiff's belongings that could not be steamed washed still contain the dust crystals that cause imminent sneezing.

90.    Instead of acknowledging testing, FP-Partridge called the inspection a "further investigation" and Plaintiff's apartment surveillance recorded FP-ESI's testing. Notably, the recording shows ESI-Thorne repeatedly make the gesture of sneezing while performing each test and collecting evidence for Foulger-Pratt's. Upon information and belief, ESI-Thorne was already aware of the elevated VOCs inside Plaintiff's apartment because ESI-Thorne only took photographs of Plaintiff's personal property that would contribute to specific VOCs that had elevated and severe levels such as alcohol bottles and a candle. The remaining "investigation" was disturbing for Plaintiff to watch because the three (3) men appeared to have knowledge of the hazards, which was concealed and omitted from Defendants' disclosures to Plaintiff pertaining to the safety of her apartment. Abruptly, ESI-Thorne stops and makes a phone call in the living room with the others starring at him. ESI-Thorne oddly stands facing the bedroom while speaking on the phone for a few minutes, hangs up, and proceeded to conduct multiple tests scattered throughout the apartment while stopping to sneeze. He concluded his testing by carrying the last specimen out inside of a large green container with what appeared to be red LED lights on the side.

91.    The health effects for HAPs' exposures are permanent, lack a cure, and severity depends on the length of exposure. Plaintiff is the eggshell Plaintiff, completely lacks the filtration system needed to collect even the smallest exposure of HAPs. Unfortunately, toxic substances enter and find a cozy home somewhere throughout Plaintiff's body. The refusal to test, refusal to transfer, and refusal to disclose the history of the site all significantly contributed to Plaintiff's long-term well-being. All the studies and science evaluating and assessing the risk of harm depending on length of exposure or quantity simply does not apply to Plaintiff.

92.     All Plaintiff can do now is wait for the onset of severe uncurable diseases.  For now, Plaintiff will try to prevent the aforementioned parties from further conspiring and harming the public and environment. The Court must consider the reasonableness of Plaintiff's request to bar Defendants from constructing the Landmark site because the plans include INOVA hospital. Patients are already vulnerable and suffering, they deserve to be in good hands.

*Conspiracy to Conceal Carbon Emissions*

93.     Plaintiff purchased an air monitoring device called Airthings, which tracked VOCs, moisture, and carbon.  Plaintiff's air monitoring reports reflected high levels of carbon and VOCs.  In addition, Plaintiff's environmental professional observed high levels of carbon, which Plaintiff disclosed to FP-Partridge who said that is not a professional reading.  Plaintiff started noticing the HVAC in The Thornton's foyer was always open and activated.  Similarly, police officers and the fire department were constantly present from the carbon alarm blaring and light flashing at the entryway.   Specifically, CEI's testing results indicated $CO_2$ levels ranging from 1326 to 1379 ppm throughout the apartment (1029 ppm outside the apartment door in the hallway and 823 ppm at opposite end of hallway outside the apartment door).  Plaintiff's new apartment N-120 also had high $CO_2$ levels: 825 ppm, 816 ppm, and 852 ppm as reflected Plaintiff's air monitoring device.

*Conspiracy to Conceal HAPs' Harmful Health Effects*

94.     Plaintiff began experiencing severe respiratory problems while breathing in the apartment.  Plaintiff notified Defendant Foulger-Pratt's Regional Property Manager Michelle Partridge to request alternative housing or testing, but both were refused.   Plaintiff saw the following physicians: two (2) general physicians, allergist, pulmonologist, and ENT.  Plaintiff was prescribed the following medications: cough suppressants, Allegra, two (2) inhalers, two (2)

46
**COMPLAINT**

nasal sprays, and three (3) packs of steroids. Plaintiff ruled out allergies (prick test), mold (blood lab), sinuses (CT scan), or asthma (chest x-ray) as the cause for symptoms.  When testing was finally approved

*Conspiracy to Conceal HAPs and Apparent Asbestos*

95.    Upon information and belief, Foulger-Pratt spent the time refusing Plaintiff's request to test N-210 trying to reduce the air pollutants.  Similarly, ESI-Thorne conspired to conceal the true levels of harmful exposures.  According to the testing's summary for TVOCs, it identified 3,400 ng/L that was a "High" level.  The images below identify the TVOCs were 3,455 ng/L, which is a "Severe" level of TVOCs.



**PRISM**
Analytical Technologies

**IAQ** *Home Survey*™
**Inspect**™

**Client Sample ID:** Between Bedroom and Living Room
**Laboratory ID:** 82301-2

**Home Air Analysis For:** Thornton Residential
**Home Tested:** 1199 S. Washington Street
Alexandria, VA 22314

**Report Number:** 82301

**Sampling Professional:** Jeff Thorne
Environmental Solutions Inc.
6114 Drum Point Rd
Deale, MD 20751

**Thank you for using IAQ Home Survey!**
If you have questions about your report,
please contact your service provider who
performed this test.

**Client Sample ID:** Between Bedroom and Living Room
**Sample Volume (L):** 27.0
**Date Sampled:** 11/06/2019
**Sample Type:** TDT UU337
**Sample Condition:** Acceptable

**Receive Date:** 11/07/2019
**Approve Date:** 11/07/2019
**Scan Date:** 11/07/2019
**Report Date:** 11/11/2019

IAQ Home Survey™ is one of the most advanced, trusted air testing products on the market today for identifying chemical sources and active mold growth in a home. Many indoor air quality (IAQ) issues identified by IAQ Home Survey can be easily remediated or eliminated. This test is an invaluable tool for homebuyers, homeowners, and renters because it can reveal important information on potential contamination issues in the home that cannot be detected by a visual inspection alone. Acting upon the information in this report will enable you to dramatically improve the air quality in your home, creating a healthier environment for you and your family.

---

**Your Indoor Air Quality Report Summary**
Your Indoor Air Quality Report has several sections describing different aspects of your home's air quality. A summary of this data is provided below; additional information and descriptions are included in the full report.

***Total Volatile Organic Compounds (TVOC) Level***
TVOC is a general indicator of the IAQ in your home (see page 2).
**Total VOCs    3400 ng/L**

***Total Mold Volatile Organic Compounds (TMVOC) Level***
TMVOC is an assessment of the actively growing mold in your home (see page 3).
**Total MVOCs    15 ng/L**

***Contamination Index (CI) Level***
The CI shows the types of air-contaminating products and materials that are present in your home (see pages 7, 8, and 9). These levels are estimates based on common home products and activities.

| Building Related Sources | | Mixed Building and Lifestyle Sources | | Lifestyle Related Sources | |
|---|---|---|---|---|---|
| *See page 7 for more detail.* | | *See page 8 for more detail.* | | *See page 9 for more detail.* | |
| M | Coatings (Paints, Varnishes, etc.) | N | Building Materials-Toluene Based | E | Personal Care Products |
| M | PVC Cement | M | Gasoline | H | Alcohol Products |
| N | HFCs and CFCs (FreonsTM) | N | Fuel Oil, Diesel Fuel, Kerosene | M | Odorants and Fragrances |
| | | N | Moth Balls (Naphthalene Based) | N | Dry Cleaning Solvents |
| | | N | Moth Crystals (p-Dichlorobenzene Based) | N | Medicinals |
| | | N | Light Hydrocarbons | | |
| | | N | Light Solvents | | |
| | | N | Methylene Chloride | | |

*Note: Severity levels begin at Normal or Minimal and progress through Moderate, Elevated, High and/or Severe. The color progression from green to red indicates results that are increasingly atypical and suggest potentially higher risk.*

| Normal | Moderate | Elevated | High | Severe |
|---|---|---|---|---|

**COMPLAINT**

**Lifestyle Related Sources**

| Contamination Index Category | Estimated VOC Level (ng/L) | Severity | Description and Suggestions for VOC Reduction |
|---|---|---|---|
| Personal Care Products | 590 | Elevated | Soap, deodorant, lotions, perfumes, hair coloring supplies, nail care supplies, oral hygiene products, etc. These products contain many VOCs that will dissipate if use is discontinued or reduced. Consider storing these products in a closed container when not in use, and dispose of unused products. Also, run an exhaust fan or open a window when using these products. Some chemical compounds associated with this category can also be found in cleaning products and building materials, consider recent cleaning or renovations/construction as possible sources. |
| Alcohol Products | 1400 | High | Household cleaning products, antiseptic wipes, hand sanitizers, some solvents, reed diffusers, consumable alcohol, and some pharmaceuticals. These concentrations will be reduced by removing unnecessary products or proper storage of those materials in closed airtight containers. Promptly rinse empty alcoholic beverage containers and place outside if possible. Consolidate cleaning products to the essentials. Consider switching to alternative methods of cleaning and sanitizing, e.g., baking soda, vinegar, borax, steam, etc., and ventilate the area during and after cleaning. Alcohol can also be found in some building materials, consider recent renovations/construction as a possible source. |
| Odorants and Fragrances | 340 | Moderate | VOCs in this category can be found in scented candles, potpourri, air fresheners, scented cleaning products, and scented personal care products. Reduce use of scented products and store unused products in a tight fitting container. |
| Dry Cleaning Solvents | 1 | Normal | Typical dry-cleaning methods employ the use of carcinogenic chemicals. Dry-cleaning should be allowed to vent outside, without plastics bags, before being placed inside. |
| Medicinals | 1 | Normal | Ointments and creams, topical first aid/pain relievers. |

**Building Related Sources**

| Contamination Index Category | Estimated VOC Level (ng/L) | Severity | Description and Suggestions for VOC Reduction |
|---|---|---|---|
| Coatings (Paints, Varnishes, etc.) | 860 | Moderate | Includes interior and exterior paints (including low- or no-VOC paints), varnishes, lacquers, some sealants, and other products that can be classified as a coating over a surface. Typically, VOCs from these products are in the 10 to 14 carbon size range and can linger for several months, sometimes longer. Ventilate as much as possible during and after application of these products and dispose of opened but unused products and related supplies if possible or store in areas that will minimize off gassing. There is some overlap between chemical compounds associated with 'Coatings (Paints, Varnishes, etc.)' and those found in 'Fuel Oil, Diesel Fuel, Kerosene.' |
| PVC Cement | 11 | Moderate | PVC cement is used to join pieces of PVC pipe together, usually for plumbing. Chemical compounds in these products can cause respiratory irritation and headaches. Ventilate the area during and after use. |
| HFCs and CFCs (FreonsTM) | 2 | Normal | Most often used as refrigerants for air conditioners and refrigerator/freezers and propellants for blown-in insulation, cushions, aerosol cans, etc. Many of these chemical compounds are being phased out because of the Montreal Protocol. |

49

**COMPLAINT**

**Mixed Building and Lifestyle Sources**

| Contamination Index Category | VOC Level (ng/L) | Severity | Description and Suggestions for VOC Reduction |
|---|---|---|---|
| Building Materials-Toluene Based | 0 | Normal | Adhesives and glues used in construction and maintenance, arts and crafts; adhesive removers; contact cement; sealants; coatings (paint, polyurethane , lacquer, thinner); automotive products, including parts cleaners. Additional sources include gasoline and other fuels. |
| Gasoline | 180 | Moderate | VOCs from gasoline are typically a result of off-gassing from gas containers and gas-powered equipment such as lawnmowers, snow blowers, mini-bikes, etc. that are stored in attached garages or basements. Does not include exhaust emissions. These items should be stored externally to the home. Additionally, gasoline VOCs can linger on clothing after refueling an automobile at a gas station. A prior spill in a garage or basement can also soak into the flooring and add to the VOC level. Gasoline includes chemical compounds that are also included in the 'Light Solvents' category. |
| Fuel Oil, Diesel Fuel, Kerosene | 0 | Normal | Often found in garages and basements. These fuels are not very volatile so will not readily get into the air, but they can linger for a long time and produce a strong, unpleasant odor. Does not include exhaust emissions. There is some overlap between chemical compounds associated with 'Fuel Oil, Diesel Fuel, Kerosene' and those found in 'Coatings (Paints, Varnishes, etc.).' |
| Moth Balls (Naphthalene Based) | 1 | Normal | Naphthalene based moth balls. May be present with p-Dichlorobenzene-based moth crystals. |
| Moth Crystals (p-Dichlorobenzene Based) | 1 | Normal | p-Dichlorobenzene based moth crystals. May be present with Naphthalene-based moth balls. |
| Light Hydrocarbons | 67 | Normal | Building materials; aerosol cans; fuel for cooking/camping/lighters; LPG; refrigerant; natural gas; propellant; blowing agent. Includes chemical compounds such as propane, butane, and isobutane. |
| Light Solvents | 0 | Normal | Stoddard solvent; mineral spirits; some coatings (paints, varnish, enamels); wax remover; adhesives; automotive products; light oils. Typically, VOCs from these products are in the 6 to 9 carbon size range. |
| Methylene Chloride | 1 | Normal | Automotive products; degreasing solvent; paint stripper; adhesive remover; aerosol propellant; insecticide. |

96.     As a result, Plaintiff finds it hard to trust any of the content. Regardless, these results unlikely depict the levels that were inhaled on September 29, 2019. As ATSDR explained to Plaintiff during their conference call, the emissions could have been worse at the time of exposure on September 29, 2019. ATSDR also explained that the tests performed were improper for testing mold. Upon information and belief, ESI-Thorne attempted to test N-210 for asbestos. Plaintiff contacted FP-Partridge to see whether additional testing was performed in N-210. FP-Partridge responded by stating Plaintiff received all the testing results. Plaintiff would

**COMPLAINT**

like to know whether Foulger-Pratt made the required HAPs disclosure above the standards as indicated below for any number without "<" marking in front of it to include benzene:



**IAQ** *Home Survey™*
*Inspect™*

Client Sample ID: Between Bedroom and Living Room
Laboratory ID: 82301-2

**EPA Hazardous Air Pollutants (HAPs)**

Hazardous air pollutants, also known as toxic air pollutants or air toxics, are those pollutants that are known or suspected to cause cancer or other serious health effects, such as reproductive effects or birth defects, or adverse environmental effects. Listed below are those HAPs that are included with the IAQ Home Survey VOC test. This test does not include all HAPs. The '<' (less than) symbol in the 'Estimated VOC Level' columns indicates that compound is below the reporting limit for this air sample. For more information about HAPs visit the EPA Air Toxics website. The exposure limits listed below can also be found in the NIOSH Guide to Chemical Hazards. The HAPs in the table below may also be listed as Significant VOCs if the concentration of that chemical compound is greater than the threshold level for a Significant VOC.

| Compound | CAS | Estimated VOC Level (ng/L) | Estimated VOC Level (ppb) | NIOSH Exposure Limit | Description |
|---|---|---|---|---|---|
| Carbonyl sulfide | 463-58-1 | < 1 | < 0.4 | None Listed | Fumigant, contaminated drywall, fuel combustion byproduct, some foods, naturally occurring at low levels |
| Carbon Disulfide | 75-15-0 | < 1 | < 0.3 | 3,000 ng/L (1,000 ppb) | Solvent, fumigant, contaminated drywall, combustion byproduct |
| Methylene Chloride | 75-09-2 | < 1 | < 0.3 | Carcinogen | Automotive products, degreasing solvent, paint stripper, adhesive remover, aerosol propellant, insecticide |
| Hexane (C 6) | 110-54-3 | 2 | 0.7 | 180,000 ng/L (50,000 ppb) | Solvent, adhesive, grease, lubricant, paints and coatings, petroleum fuel component |
| 1,1,1-Trichloroethane | 71-55-6 | < 1 | < 0.2 | C 1,900,000 ng/L (350,000 ppb) | Adhesives, lubricants, cleaners, solvents |
| Benzene | 71-43-2 | 2 | 0.7 | 320 ng/L (100 ppb) | Gasoline. Less common sources include some discontinued solvents, printing and lithography, paints and coatings, rubber, dry cleaning, adhesives, detergents |
| 1,2-Dichloroethane | 107-06-2 | < 1 | < 0.2 | Carcinogen; 4,000 ng/L (1,000 ppb) | PVC production, solvent for rubber, insecticides, oils, waxes, gums, resins, rug and upholstery cleaners |
| Trichloroethene | 79-01-6 | < 1 | < 0.2 | Carcinogen | Dry cleaning, degreasers and cleaners for home/automotive, varnish removers, anesthetic |
| Methyl methacrylate | 80-62-6 | < 1 | < 0.3 | 410,000 ng/L (100,000 ppb) | Acrylic Polymers for paints and coatings, adhesives, fillers, solvent, pharmaceuticals, personal care |
| Toluene | 108-88-3 | 13 | 3 | 375,000 ng/L (100,000 ppb) | Gasoline, adhesives (building and arts/crafts), contact cement, solvent, heavy duty cleaner |
| Tetrachloroethene | 127-18-4 | < 1 | < 0.1 | Carcinogen | Dry cleaning, adhesives, automotive cleaners, polishes |
| Ethylbenzene | 100-41-4 | 3 | 0.8 | 435,000 ng/L (100,000 ppb) | Gasoline, paints and coatings, solvent, pesticide |
| m,p-Xylene | 108-38-3, 106-42-3 | 12 | 3 | 435,000 ng/L (100,000 ppb) | Gasoline, paints and coatings, adhesives and cements, solvent, print cartridges |
| o-Xylene | 95-47-6 | 5 | 1 | 435,000 ng/L (100,000 ppb) | Gasoline, paints and coatings, adhesives and cements, solvent, print cartridges |
| Styrene | 100-42-5 | 3 | 0.7 | 215,000 ng/L (50,000 ppb) | Polystyrene foam, synthetic rubber, flavoring agent |
| 1,4-Dichlorobenzene | 106-46-7 | < 1 | < 0.2 | Carcinogen | Moth balls/crystals, room deodorant |
| Naphthalene | 91-20-3 | 2 | 0.4 | 50,000 ng/L (10,000 ppb) | Gasoline, diesel, Moth balls/crystals, insecticide |

These results are authorized by the Laboratory Director or approved representative

This analysis was performed by Prism Analytical Technologies (Prism). The results contained in this report are dependent upon a number of factors over which Prism has no control which may include, but are not limited to, the sampling technique utilized, the size or source of sample, the ability of the sampler to collect a proper or suitable sample, the compound(s) which make up the TVOC and/or the type of mold(s) present. Therefore, the opinions contained in this report may be invalid and cannot be considered or construed as definitive and neither Prism nor its agents, officers, directors, employees or successors shall be liable for any claims, actions, causes of action, costs, fees of service, medical or other expenses or any compensation whatsoever which may now or hereafter occur or accrue based upon the information or opinions contained herein.

© Copyright 2019, Prism Analytical Technologies. All rights reserved

Page 11 of 11                                                                A2-IAQHS 3.4

Property Location: 1199 S Washington Street, Alexandria, VA 22314          Date of Inspection:11/6/2019

*Conspiracy to Conceal Liability*

97.    Foulger-Pratt attempted to conceal liability in the lease agreement that includes a blanket waiver of liability, which Plaintiff tried to have modified to no avail. Subsequent to receiving the elevated VOCs and carbon results, Foulger-Pratt attempted to waive liability for harm caused by asking the Plaintiff to sign a non-disclosure agreement that was titled a settlement agreement and found Foulger-Pratt not liable for any harm. Plaintiff refused to sign the agreement nor did Plaintiff cash the allegedly inadvertent refund check mailed from Foulger-Pratt's Maryland office. In addition, City immediately closed Plaintiff's online complaint, suggested Plaintiff sweep away the spiders and wipe away the mold, encouraged to prematurely file in Housing Court, and never responded when the resting results were disclosed or in response to the email verifying whether asbestos was abated at The Thornton.

*Conspiracy to Conceal Assets*

98.    In October 2019, Defendant Foulger-Pratt sold ownership of The Thornton to SREIT Thornton at Alexandria, LLC but maintained management authority. SREIT Thornton at Alexandria, LLC is not a company with employees. It is an entity that exists solely to work with advisors to sell units as stock. Foulger-Pratt apparently still owns The Thornton, but investments would simply make The Thornton's assets harder to legal retrieve. Piercing the corporate veil because SREIT would be simply an alter ego of Defendant Foulger-Pratt executives.

## **FEDERAL CLAIMS**

### **FIRST CLAIM**

### **Supplemental Environmental Project**

99.    Plaintiff repeats and incorporates by reference paragraphs 1 through 99, and asserts, City and Foulger-Pratt neglected mandatory requirements to adhere to federal, state, and

local environmental regulations, which resulted in The Thornton's hazardous contamination that caused Plaintiff harm, exists as a threatened release, and will likely continue to harm the public and environment.

100.    As a result, City and Foulger-Pratt must immediately test the site asbestos, VOCs, HAPs, silica, and BCM NESHAPs with ATSDR's review.  Subsequently, City and Foulger-Pratt should establish a SEP to undertake proper remedial action to inspect, test, and remove any hazardous substances that exceed emission standards.  City and Foulger-Pratt should coordinate work with the EPA,

## SECOND CLAIM

### Violation of Clean Air Act NESHAP, 42 U.S.C. § 7413(c)

101.    The Plaintiff repeats and incorporates by reference paragraphs 1 through 91, and asserts, Defendants City of Alexandria and Foulger-Pratt violated the Clean Air Act NESHAP by failing to apply for another permit to conduct emissions testing for asbestos after the OSHA report for asbestos was filed.

## THIRD CLAIM

### Toxic Substance Control Act Violation 53 U.S.C. § 2603 Thereunder

102.    The Plaintiff repeats and incorporates by reference paragraphs 1 through 91, and asserts, City and Foulger-Pratt Defendants City of Alexandria and Foulger-Pratt violated the Toxic Substances Control Act by failing to reduce VOCs emissions such as formaldehyde, which the EPA needs to request emission testing to secure the health and welfare of The Thornton's tenants and the public.

## FOURTH CLAIM

### Violation of the Fair Housing Act 42 U.S.C. § 3604 Thereunder

103.    The Plaintiff repeats and incorporates by reference paragraphs 1 through 91, and asserts, Defendants City of Alexandria and Regional Property Manager refused Plaintiff's request for a transfer or alternative temporary housing.  Plaintiff's available funding were limited due to the professional testing, medical co-payments, prescriptions, and hotels from the onset of the harmful encounter.  Plaintiff expressed to the Regional Property Manager Michelle Partridge repeatedly that Plaintiff was experiencing trouble breathing inside of the apartment.  Plaintiff also informed Regional Property Manager Michelle Partridge that physicians proscribed inhalers to keep airways open while inside of the apartment.  Inability to breathe is a disability.  Defendant Foulger-Pratt's Regional Property Manager Michelle Partridge failed to make any reasonable accommodations.  In fact, Michelle Partridge told Plaintiff that there were no "compatible" units available for the Plaintiff.  Plaintiff could see there were several units with the same layout and square footage available online.  Upon further inquiry about availability to transfer or relocate temporarily, Michelle Partridge made clear that Plaintiff was only permitted to stay in an affordable unit but failed to explain how the units are different beyond rental amount.  Michelle Partridge refused to acknowledge that the refusal to offer a reasonable accommodation, which would allow a tenant to breathe while home was refused because of money.  Michelle Partridge decided to ignore health concerns for an entire month as Foulger-Pratt refused to test the apartment and recklessly left Plaintiff terrified to sleep wondering whether Plaintiff would stop breathing through the night.

## **FIFTH CLAIM**

### **Witness Tampering 18 U.S.C. § 1512(b) Thereunder**

104.  Plaintiff repeats and incorporates by reference paragraphs 1 through 91, and asserts, Foulger-Pratt attempted to obstruct justice by asking Plaintiff to sign a non-disclosure agreement

to receive a refund check that had a statement waiving all liability.  Similarly, City suggested

Plaintiff prematurely filed a claim in landlord tenant court apparently for double jeopardy to

preclude filing this complaint.

## SIXTH CLAIM

### Conspiracy 18 U.S.C. § 371 Thereunder

105.  Plaintiff repeats and incorporates by reference paragraphs 1 through 91, and asserts, all

listed Defendants conspired to conceal fraudulent and negligent misconduct that exposed the

Plaintiff and public to risk of harm.  Defendants conspired to neglect the necessary testing that

could have prevented Plaintiff's personal injury.  Defendants coordinated and conversed about

methods for avoiding requirements in an effort to protect financial investments.

## SEVENTH CLAIM

### Making a False Statement 18 U.S.C. § 1001(a)(2) Thereunder

106.    Plaintiff repeats and incorporates by reference paragraphs 1 through 91, and

asserts Defendant Foulger-Pratt made a false statement when completing the Asbestos Affidavit

forms that indicated asbestos had been abated on March 4, 2016, when the Asbestos Validation

indicated March 10, 2016, was the date the asbestos was abated.

## EIGTH CLAIM

### Violations of Fair Debt Collections Practices Act 15 U.S.C. § 1692e Thereunder

107.    The Plaintiff repeats and incorporates by reference paragraphs 1 through 91, and

asserts, Foulger-Pratt, Kurman, TAM, Warfield, and Manosalva violated 15 U.S.C. § 1692e,

which prohibits 'any false, deceptive, or misleading representations or means in connection with

the collection of any debt.'  Briefly, Kurman and Warfield fraudulently pursued Foulger-Pratt's

inaccurate debt and payment omissions.  In addition, Foulger-Pratt fraudulently identified

**COMPLAINT**

damages that never occurred.  Specifically, Foulger-Pratt, Kurman, and Warfield relied on images of sound pads on the ceiling with command strips to suggest Foulger-Pratt's incurred the cost of repairing the ceiling form command strips.  Images were from the living room and the invoice identifying the alleged damages were for paint and drywall to the bedroom.  Overall, the invoice appeared to be for the normal wear and tear for paint and small holes for picture hanging, which Plaintiff was not liable for according to the lease agreement.  It is unclear whether TAM or Manosalva, in his sole capacity, performed the services because TAM's business license was inactive the date the services were rendered.

**STATE CLAIMS**

**NINTH CLAIM**

**Negligence**

108.    Plaintiff repeats and incorporates by reference paragraphs 1 through 91, and asserts, Foulger-Pratt's neglect was willful and wanton.  Plaintiff was exposed to Foulger-Pratt's harm from September 29, 2019, for the day of hazardous release until December 7, 20129 when Plaintiff for the transfer day.  The movers even inquired about whether Plaintiff had asthma due to the sound of her wheezing.  Foulger-Pratt had a legal duty to maintain safe premises for tenants.  Foulger-Pratt breached the duty by failing to properly perform repairs and maintaining a functional HVAC.  Failing to properly conduct repairs by preventing toxins from becoming airborne and collecting on the bedroom carpet, caused Plaintiff to inhale harmful pollutants while vacuuming that remained airborne and harmed Plaintiff for a month.  But for an effective HVAC, Plaintiff may have inhaled fewer hazardous air pollutants. Plaintiff suffered with the following: airway obstruction, wheezing, runny nose, sneezing, coughing, head pressure, migraine, chronic fatigue, night sweats, diarrhea, swollen eyelids, loss of hair, and arrythmia.

56

**COMPLAINT**

Plaintiff saw the following physicians: two (2) general physicians, allergist, pulmonologist, and ENT. Plaintiff was prescribed the following medications: cough suppressants, Allegra, two (2) inhalers, two (2) nasal sprays, and four (4) packs of steroids. Plaintiff ruled out allergies (prick test), mold (blood lab), sinuses (CT scan), or asthma (chest x-ray) as the cause for symptoms.

109.    A reasonable person would not find that failure to purchase a HEPA vacuum contributed to Plaintiff's harm. Similarly, a reasonable person would not find that alcohol or a small candle would contribute to Plaintiff's airway obstruction. In contrast, Plaintiff's assumption of risk, by commencing the lease agreement with knowledge that The Thornton may have a common mold problem based on constructive notice from online reviews, should not be the standard to determine whether Plaintiff's claim should be barred. Overall, Plaintiff's claim should not be barred because Plaintiff did not contribute to the exposure.

## TENTH CLAIM

### Breach of Contract

110.    Plaintiff repeats and incorporates by reference paragraphs 1 through 91, and asserts, Foulger-Pratt's lease agreement stated the obligation of management was to "act with customary diligence to maintain fixtures, hot water, heating, and A/C equipment; substantially comply with applicable federal, state, and local laws; and make all reasonable repairs, subject to your obligation to pay for damages for which you are liable." On August 8, 2019, Foulger-Pratt breached the lease agreement by failing to provide water. Plaintiff had to call the emergency maintenance line to inquire about the lack of water. In response, maintenance asked if it could wait until the morning because he had to head that way in the morning. Plaintiff demanded that someone arrives without further delay to turn the water on because it is unsanitary and inhabitable. On September 29, 2019, Foulger-Pratt breached the lease agreement by failing to

maintain the HVAC. FP-Partridge suggested the cause of air pollutants was due to the HVAC and they would need to break down some walls to check it.

## ELEVENTH CLAIM

### Breach of Implied Warranty of Good Faith and Fair Dealing

111.    Plaintiff repeats and incorporates by reference paragraphs 1 through 91, and asserts, that every contract has an implied warranty of good faith and fair dealing. Foulger-Pratt and Plaintiff had a lease agreement that establish an implied duty to perform transaction with good faith and fair dealing. Foulger-Pratt breached the implied warranty by accepting Plaintiff's rent and sending Quit Claim notices pending ESI's test results while Plaintiff suffered from daily exposures to harmful substance that Foulger-Pratt caused.

## TWELTH CLAIM

### Assault

112.    The Plaintiff repeats and incorporates by reference paragraphs 1 through 91, and asserts, Foulger-Pratt owned The Thornton and apartment N-210 that contained hazardous substances. From September 29, 2019, to December 7, 2019, Plaintiff inhaled the hazardous substances inside Foulger-Pratt's apartment N-210. Some of the hazardous substances were identified by ESI's Discovery Report dated November 6, 2019. As a result of contact with Foulger-Pratt's hazardous substances, Plaintiff suffered from respiratory, gastric, cardiac, and central nervous system medical complications.

## THIRTEENTH CLAIM

### Battery

113.    The Plaintiff repeats and incorporates by reference paragraphs 1 through 91, and asserts, Foulger-Pratt owned The Thornton and apartment N-210 that contained hazardous

substances. From September 29, 2019, to December 7, 2019, Plaintiff inhaled the hazardous

substances inside Foulger-Pratt's apartment N-210. Some of the hazardous substances were

identified by ESI's Discovery Report dated November 6, 2019. As a result of contact with

Foulger-Pratt's hazardous substances, Plaintiff suffered from respiratory, gastric, cardiac, and

central nervous system medical complications.

## FOURTEENTH CLAIM

### Intentional Infliction of Emotional Distress

114.    Plaintiff repeats and incorporates by reference paragraphs 1 through 91, and

asserts, Foulger-Pratt went beyond measures to make sure Plaintiff was never at ease. Plaintiff

expressed loss of funds from alternative housing, testing, and medical bills, but Foulger-Pratt

never hesitated to apply late fees and taping opened 5-day notices for public shaming. In

addition, Plaintiff was told Foulger-Pratt was willing to provide some relief after transferring me

from the inhabitable unit into the unit, but Plaintiff had to sign a non-disclosure agreement.

Upon reading the non-disclosure agreement, Plaintiff noticed it was titled settlement agreement

and found The Thornton was not liable for any harm. Plaintiff had to refuse signing the alleged

non-disclosure agreement with hidden liability waivers. Plaintiff received a check addressed

from Foulger-Pratt headquarters in Maryland, but Plaintiff never cashed it. Plaintiff asked the

leasing office about the check, and the leasing office stated it was inadvertently sent from them.

Again, the check was mailed from headquarters where printing tenant checks are not ordinary

transactions.  Foulger-Pratt and FP-Partridge's ability to leave Plaintiff in N-210 with

knowledge of the historic asbestos releases and Plaintiff's deteriorating medical condition and

persistently refuse testing beyond 30-days is willful and wanton. Plaintiff suffered from physical

pain caused by the toxins, anxiety, shock, disappointment, exhaustion, frustration, anxiety,

nervousness, and hopelessness. After transferring to N-102, Plaintiff did not receive a mail key and did not change her address so she could continue to retrieve her mail. After a month, Plaintiff's accounts were terminated. Plaintiff called servicers and received notice of the new tenant in N-210. Foulger-Pratt's efforts to conceal presence of the new tenant in N-210, only caused Plaintiff to experience further emotional harm and financial distress from waking up to discover all of Plaintiff's services were disconnected and having to pay higher rates and additional fees to reconnect. Plaintiff paid full price for the remainder of the lease and was charged an early termination fer moving to a location where services were not offered, and Plaintiff had to dispute the fee. In order to waive payment, xFinity investigated because apparently, they received notice that I no longer resided there. An xFiniity service representative explained that only a landlord can authorize disconnection of services without the service holder's confirmation. No one contacted Plaintiff before services were disconnected. Upon information and belief, Foulger-Pratt intentional interfered with third-party transactions and caused Plaintiff to suffer further harm

115.    In addition to incurring xFinifiy fees, Foulger-Pratt charged a $75 electric vacant fee each month when Foulger-Pratt cancelled my electricity account. In order to avoid breaching any term in the lease agreement, Plaintiff had to take an online 300% interest rate loans afterhours on the weekend. Plaintiff even asked whether Plaintiff could wait to submit rent until the testing results returned because if it was not safe Plaintiff would leave. Regional Property Manager Michelle Partridge never responded, and Plaintiff took out another loan to make sure Plaintiff met her contractual responsibilities. The next day, the test results were disclosed.

## **PRAYER FOR RELIEF**

116. **WHEREFORE,** Plaintiff respectfully requests that this Court;

a.  Issue a permanent injunction requiring City and Foulger-Pratt conduct testing under the review of ATSDR and establish EPA's SEP for The Thornton;

b.  Award Plaintiff damages for City's and Foulger-Pratt's CAA and TSCA violations;

c.  Award Plaintiff compensatory and punitive damages in an amount to be subsequently established and filed for Foulger-Pratt's violations;

d.  Award Plaintiff compensatory and punitive damages in an amount to be subsequently established and filed for City's violations;

e.  Award Plaintiff compensatory and punitive damages in an amount to be subsequently establish and filed for ESI, PE, CEI, RCG&A, and AR's aiding and abetting in concealing non-compliance with environmental regulations;

f.  Award Plaintiff compensatory and punitive damages in an amount to be subsequently establish and filed for Kurman, Warfied, TAM, and Manosalva for pursing fraudulent debt;

g.  Award Plaintiff reasonable court filing and attorney fees; and

h.  Award Plaintiff any damages this Court feels is necessary.

Respectfully submitted,

Dated: November 24, 2021
Alexandria, VA

Courtney Graves, Esq., *Pro Se*
200 N. Washington Street, Unit 320547
Alexandria, VA 22320
Phone: (571) 771-7818
Email: CourtneyGravesEsq@gmail.com
(DC #1034221 & MA #694451)

RECEIVED

2021 DEC -7 P 5:23

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

**COMPLAINT**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
_Alexandria_ **DIVISION**

RECEIVED

Courtney Graves
_____
Plaintiff(s),

2021 DEC -7 P 5: 22

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

v.

Civil Action Number: 1:21-CV-1367 MSN/TCB

Farber-Pratt Companies, LLC et al.
_____
Defendant(s).

## LOCAL RULE 83.1(M) CERTIFICATION

I declare under penalty of perjury that:

No attorney has prepared, or assisted in the preparation of___Complaint_____.
**(Title of Document)**

Courtney Graves
_____
Name of _Pro Se_ Party (Print or Type)

_____
Signature of _Pro Se_ Party

Executed on: ___12/7/21_____ (Date)

**OR**

The following attorney(s) prepared or assisted me in preparation of _____.
**(Title of Document)**

_____
(Name of Attorney)

_____
(Address of Attorney)

_____
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document

_____
(Name of _Pro Se_ Party (Print or Type)

_____
Signature of _Pro Se_ Party

Executed on: _____ (Date)