IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| COURTNEY GRAVES,<br>　　　　　　*Plaintiff*,<br><br>　　v.<br><br>FOULGER-PRATT COMPANIES, LLC, *et al.*,<br>　　　　　　*Defendants*. | Case No.: 1:21-cv-01367 (MSN/WEF) |

## **MEMORANDUM OPINION & ORDER**

This matter comes before the Court on motions to dismiss the Complaint filed by defendants City of Alexandria (Dkt. No. 11); Thornton Residential Holdings, LLC, Foulger-Pratt Companies, LLC, FP Alexandria, LLC, Foulger-Pratt Residential, LLC, Foulger-Pratt Management, LLC, Foulger-Pratt Development, LLC, Foulger-Pratt Contracting, LLC, and Thornton Residential Holdings Title Holder LLC (Dkt. No. 16); Robert J. Robertson and Apartment Restorers, LLC (Dkt. No. 19); Hunter Warfield, Inc. (Dkt. No. 36); R. Christopher Goodwin & Associates, Inc. (Dkt. No. 46); Offit Kurman, P.A. (Dkt. No. 49); SREIT Thornton at Alexandria, LLC (Dkt. No. 53); the United States Environmental Protection Agency and Michael Regan, in his official capacity as Administrator of the United States Environmental Protection Agency (Dkt. No. 72); Compliance Environmental International, Inc. (Dkt. No. 75); and Progress Environmental, LLC (Dkt. No. 80).

Upon consideration of the pleadings, this Court **GRANTS** the motions to dismiss and **DISMISSES** the Complaint.

1

## I.    BACKGROUND

### A.    PROCEDURAL HISTORY

On December 7, 2021, Courtney Graves, proceeding *pro se*, filed a complaint against twenty-four defendants alleging fourteen causes of action related to purported exposure to asbestos or other toxic substances at her residence in an apartment building in Alexandria, Virginia.  Compl. (Dkt. No. 1). Although several defendants agreed to waive service of a summons, *see* (Dkt. Nos. 7, 9, 10, 15), many defendants were not served with a summons until well after the 90-day deadline imposed under the Federal Rules, *see* Fed. R. Civ. P. 4(m); (Dkt. Nos. 44, 45, 58–61, 66). On February 28, 2023, the Court ordered Graves to show cause as to why, pursuant to Rule 4(m), it should not dismiss the defendants who had not yet been served with the Complaint. (Dkt. No. 86). In Graves's response to the February 28 show cause order, she voluntarily dismissed defendants Alexandria Office of Housing, Office of Historic Alexandria Archaeology, Department of Code Administration, and Board of Architectural Review. (Dkt. No. 90 at 10).[1] Regarding the remaining defendants who have yet to be served—Environmental Solutions Inc. ("Environmental Solutions"); TAM General Contracting, LLC ("TAM General Contracting"); and Tomas Manosalva, Graves concedes that she had not attempted service on these defendants until at least October 2022 but that, since then, she has been diligently pursuing service. *Id.* at 2, 6–8. These three defendants, according to Graves, have evaded service. *Id.* at 6–8. In her response, Graves requests an extension to complete service on these three defendants. *Id.* at 5, 10. Given this the Court's ruling below, the Court denies this request as moot.

---

[1]      Because the Alexandria Office of Housing, Office of Historic Alexandria Archaeology, Department of Code Administration, and Board of Architectural Review are "departments of municipal governments," they "are not capable of being sued in their own names" in Virginia. *3Thomas v. Peterson Util. Lines Water Dep't*, No. 3:19-cv-00162, 2019 WL 6792764 (E.D. Va. Dec. 12, 2019). Accordingly, these municipal government department defendants are dismissed with prejudice.

With the exception of the three defendants who have yet to be served, each defendant has filed a motion to dismiss the Complaint. Graves has filed responses in opposition to the motions,[2] and most of the movants have filed replies in support of their motions.[3] The Court is satisfied that oral argument would not aid in the decisional process. Accordingly, this matter is ripe for resolution.

### B.    FACTUAL ALLEGATIONS

On August 8, 2019, Graves moved into Unit N-210 of the Thornton, an apartment complex in Alexandria, Virginia, under a 12-month lease agreement. Compl. ¶ 25. The Thornton is owned and managed by one of the Foulger-Pratt entities.[4] On September 29, 2019, Graves vacuumed her bedroom carpet, which she alleges was "saturated with toxic substances" and caused her to feel ill. Compl. (Dkt. No. 1) ¶ 2. Graves alleges that her symptoms included "respiratory, gastric, cardiac, and nervous system complications such as wheezing, chronic diarrhea, heart irregularity, severe migraines, facial swelling, night sweats, and body aches." *Id.* Her symptoms allegedly ceased when she left the unit but became more severe each day upon her return. *Id.* Graves also alleges that "small white crystals," which she speculates to be crystalline silica, have gathered in her apartment unit and cause her to sneeze upon contact. *Id.* ¶ 89.

On October 7, 2019 Graves alleges that she emailed Foulger-Pratt to "notif[y] Foulger-Pratt of the toxic exposure," which at the time she believed to be mold exposure, and requested

---

[2]      Graves has not filed a brief in response to the motion to dismiss filed by SREIT Thornton at Alexandria, LLC filed on December 13, 2022 (Dkt. No. 53), and her time to do so has lapsed. Local Rule 7.

[3]      Defendants R. Christopher Goodwin & Associates, Inc. and Offit Kurman, P.A. have not filed reply briefs in support of their motions, and their time to do so has lapsed.

[4]      "Foulger-Pratt" herein collectively refers to defendants Thornton Residential Holdings, LLC; Foulger-Pratt Companies, LLC; FP Alexandria, LLC; Foulger-Pratt Residential, LLC; Foulger-Pratt Management, LLC; Foulger-Pratt Development, LLC; Foulger-Pratt Contracting, LLC; and Thornton Residential Holdings Title Holder LLC. Although Graves defines Foulger-Pratt in the Complaint to include SREIT Thornton at Alexandria, LLC ("SREIT"), SREIT and the Foulger-Pratt entities have filed independent motions to dismiss. SREIT clarifies that it has interpreted any allegations against Foulger-Pratt as allegations against SREIT as well. SREIT Mem. (Dkt. No. 54) at 1 n.1.

"air testing, new carpet, and an exterminator to reduce small black spiders" in the apartment. *Id.* ¶ 3. Graves alleges that Foulger-Pratt "concealed the toxins and prioritized Plaintiff's remedial requests by removing the bedroom carpet first without performing any testing, which prevented [her] from receiving proper medical treatment and interfered with evidence that this Court would rely on to establish their liability." *Id.* A representative from Apartment Restorers, LLC ("Apartment Restorers") allegedly inspected her unit, before and after September 29, 2019, and concluded there was no mold. *Id.* ¶¶ 4, 7. During the second inspection performed by Apartment Restorers, Graves alleges she "shook her new vacuum container . . . and . . . dust and debris . . . spilled onto the floor causing the [Apartment Restorers] inspector to jerk back and immediately conclude the inspection." *Id.* ¶ 7.

On October 7, 2019, Graves notified the City of Alexandria of the alleged toxic exposure by submitting an online complaint to the Board of Housing Authority. *Id.* at ¶ 5. Graves alleges her complaint was never reviewed and was instead "immediately closed" because the city concluded that the information submitted by Graves "does not indicate, as required by Virginia Code, that there is a condition in the unit 'that constitutes a material noncompliance by the landlord with the rental agreement or with provisions of law . . . .'" *Id.* ¶ 5. On November 4, 2019, Foulger-Pratt offered to terminate her lease with no penalty, but she declined. *Id.* ¶¶ 6, 8, 86. Rather, she elected to "stay[]" in the unit "until testing was granted [in order] to receive adequate medical treatment." *Id.* ¶ 8.

Graves alleges that she visited "two general practitioners, [an] allergist, [a] pulmonologist, and [an] ENT," who administered various medical tests on her but determined that Graves "did not have asthma, environmental allergies, or sinus complications and mold was not found in [her] blood." *Id.* ¶ 8. Graves also alleges that "physicians help[ed] to keep her airways open while inside

of the apartment" and that she took "medications to reduce some of the symptoms" but provides no additional details about these physicians or medications. *Id.* ¶ 88.

On November 6, 2019, Foulger-Pratt informed Graves that it would further investigate her complaint. *Id.* ¶ 9. Her unit was inspected by Environmental Solutions, which generated a report about the level of various chemical substances in her unit that Graves alleges is a "misrepresent[ation of] the contamination level." *Id.* ¶¶ 9–10. Although Graves alleges that Foulger-Pratt initially denied Graves the option of transferring to 1-bedroom units similar to the one she occupied because those units were not registered with the City of Alexandria's affordable housing program (*id.* ¶ 87), Graves was ultimately transferred to a new unit within the apartment complex without penalty on December 7, 2019 (i*d.* ¶ 11). Graves alleges that Foulger-Pratt subsequently asked her to sign a non-disclosure agreement and that a waiver of liability was hidden among the paperwork. *Id.* ¶ 13. She declined to sign the agreement. *Id.*

In apparent support of her allegations toxic chemicals are present at the site of the Thornton, Graves describes in detail the history of the construction and development of the Thornton. Graves asserts that documents received from a Freedom of Information Act request allegedly reveal that Foulger-Pratt discovered and mishandled asbestos during the demolition of the building previously at the site of the Thornton. *Id.* ¶¶ 14–15; *see also id.* ¶¶ 65–81. These FOIA records also allegedly revealed emails between some of the defendants "that discussed how Foulger-Pratt and its engineers exposed brick kilns, disturbed black soil and coal water that was contained in brick rubble and disturbed a sewer trench from the former 1940s apartment complex" at the site on which the Thornton sits. *Id.* ¶ 16–17. Graves alleges that Foulger-Pratt "concealed hazardous emissions such as asbestos carbon, HAPs, and apparent volatile organic compounds . . . to . . . fraudulently induce tenants to enter lease agreements" and that Foulger-Pratt's conduct related to the site

violated several federal, state, and local laws, including the Clean Air Act and the Toxic Substances Control Act. *See, e.g.*, *id.* ¶ 19. Graves further alleges that "Foulger-Pratt refused to test the apartment because [it] refused to approve a reasonable accommodation for Plaintiff's disability." *Id.* ¶ 87. Graves alleges that, as a result of tonsil removal, she "lack[s] the initial barrier that others with tonsils receive from their filtration and ability to collect particulates in the airway and flush them out of the body," a condition she contends exacerbated her symptoms. *Id.*

Graves alleges that she was exposed to hazardous air pollutants ("HAPs") "for over thirty . . . days as Foulger-Pratt refused a litany of requests to test the air, which resulted in [Graves's] exposure to harmful substances that . . . directly caused an imminent onset of severe respiratory conditions . . . ." *Id.* ¶ 11. Graves further contends that the City of Alexandria "knew [of] or recklessly disregarded" Foulger-Pratt's conduct and "failed to take required action to prevent hazardous waste and HAPs releases from harming the public and the environment." *Id.* ¶ 19. She alleges that several of the defendants engaged in conspiracies to undertake various actions, including "to conceal structural defects" at the Thornton (*id.* ¶¶ 82-83), to "evade litigation," (*id.* ¶¶ 84-92), "to conceal carbon emissions" (*id.* ¶93), to "conceal HAPs' harmful health effects," (*id.* ¶ 94), to "conceal HAPs and apparent asbestos," (*id.* ¶ 95-97), to "conceal liability" (*id.* ¶ 97), and to "conceal assets," (*id.* ¶ 98).

Graves also alleges that defendants Foulger-Pratt, Offit Kurman, P.A. ("Kurman"), Hunter Warfield, Inc. ("Warfield"), TAM, and Manosalva pursued "fraudulent invoices" relating to damage to her unit, with the intent of portraying Graves as contributorily negligent. *Id.* ¶ 20. Graves alleges that Warfield "continues to mail letters pursuing a fraudulent debt." *Id.* Among other relief, Graves seeks a permanent injunction requiring the City of Alexandria and Foulger-Pratt to conduct testing at the site of the Thornton and to establish a Supplemental Environmental Project; damages

for the City of Alexandria's and Foulger-Pratt's failure to comply with federal environmental statutes; and damages for certain defendants' alleged wrongdoing in "aiding and abetting" Foulger-Prat "in concealing [its] non-compliance with environmental regulations"; and damages for certain defendants' pursuit of an allegedly fraudulent debt. Compl. at Prayer for Relief.

## II.   LEGAL STANDARD

### A.   RULE 12(b)(1)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges a court's jurisdiction over the subject matter of the suit. A challenge under Rule 12(b)(1) may be facial or factual. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). If a defendant challenges the factual predicate of the court's subject matter jurisdiction, the defendant may attack "the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *White v. CMA Const. Co., Inc.*, 947 F. Supp. 231, 233 (E.D. Va. 1996) (cleaned up). Where defendants make a factual challenge to subject matter jurisdiction, the court "may then go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings." *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). A court may consider evidence outside of the pleadings without converting a Rule 12(b)(1) motion to one for summary judgment. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). There is a presumption that cases fall outside of a federal court's limited jurisdiction; the "burden of establishing the contrary" therefore rests on the plaintiff. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).

### B.   RULE 12(b)(6)

This Court may grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) when a complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed.

R. Civ. P. 12(b)(6). To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). A plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Nevertheless, a plaintiff must make more than bald accusations or mere speculation; "naked assertions devoid of further factual enhancement," and "a formulaic recitation of the elements of a cause of action" are insufficient under Rule 12(b)(6). *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). A plaintiff's complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action. *Twombly*, 550 U.S. at 556 (internal quotation marks omitted). When considering a motion under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).

A complaint by a *pro se* plaintiff should be liberally construed. *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). But the Court's "task is not to discern the unexpressed intent of the plaintiff." *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006). A *pro se* complaint must still "contain sufficient facts 'to raise a right to relief above the speculation level' and 'state a claim to relief that is plausible on its face.'" *Hundley v. Thomas*, 719 F. App'x 250, 251 (4th Cir. 2018) (quoting *Twombly*, 550 U.S. at 555, 570).

## III.  ANALYSIS

As a preliminary matter, Graves introduces new factual allegations and new causes of action not present in the Complaint in several of her opposition briefs. *See, e.g.*, Pl. Opp. to Foulger-Pratt Mem. (Dkt. No. 26) at 18–26 (discussing why the Complaint's factual allegations

support common law conspiracy under Virginia law notwithstanding the failure to plead common law conspiracy as a cause of action in her Complaint). The Court declines to consider any factual allegations and causes of actions that Graves has raised for the first time in briefing.

Moreover, in her opposition briefs, Graves has also requested leave to amend the Complaint to address certain deficiencies in the Complaint. The Court notes that Graves has not filed a separate motion seeking leave from the Court to file any such amendment. In any event, the Court denies these requests for leave to amend the Complaint as futile for the reasons stated herein. Because the Court declines to exercise supplemental jurisdiction over the state law claims, any request for leave to amend the allegations as it relates to these causes of action are denied as moot.

## A.    SUPPLEMENTAL ENVIRONMENTAL PROJECT (COUNT 1)

Count 1 raises a claim entitled "Supplemental Environmental Project." Compl. ¶¶ 99–100. Graves demands that the City of Alexandria and Foulger-Pratt "establish a Supplemental Environmental Project ["SEP"] in accordance with the Environmental Protection Agency's . . . SEPs Policy for asbestos and brick kiln emissions to prevent the threatened release of hazardous waste and hazardous air pollutants . . . that harmed [her]." *Id.* ¶ (1). Graves requests that, pursuant to the SEP, the City of Alexandria and Foulger-Pratt "undertake proper remedial action to inspect, test, and remove any hazardous substances that exceed emission standards," and that they "should coordinate [such] work with the EPA[.]" *Id.* ¶ 100.

A SEP is "an environmentally beneficial project or activity that is not required by law, but that a defendant agrees to undertake as part of the settlement of an enforcement action. SEPs are projects or activities that go beyond what could legally be required in order for the defendant to return to compliance, and secure environmental and/or public health benefits in addition to those achieved by compliance with applicable laws." *United States v. Bayer Cropscience LP*, No. 2:15-CV-13331, 2018 WL 3553413, at *2 (S.D.W. Va. July 24, 2018). This Court finds no authority,

and Graves cites none, under which it can demand a private party to undertake a SEP absent, for instance, a consent decree with the EPA or an underlying EPA enforcement action. *Cf. Bayer*, 2018 WL 3553413, at *2 (denying citizen plaintiffs' motion to intervene for lack of standing in case brought by United States requesting court approval of modification of consent decree). There is no underlying EPA enforcement action or consent decree at issue here. Accordingly, Graves fails to state a claim for this cause of action. No further amendment will cure this deficiency, and the Court dismisses this claim with prejudice.

### B.   CLEAN AIR ACT AND TOXIC SUBSTANCE CONTROL ACT (COUNTS 2, 3)

Counts 2 and 3 allege violations under the Clean Air Act and the Toxic Substance Control Act, respectively. Compl. ¶¶ 101–102.  Under the Clean Air Act, an individual may bring a citizen suit to enforce its requirements provided that notice of the violation is first provided to EPA, to the state in which the violation occurs, and to any alleged violator at least 60 days before the suit is filed. 42 U.S.C. § 7604(b)(1). Likewise, citizens may not commence a civil action under the TSCA unless notice has been provided to the EPA and the alleged violator(s) at least 60 days before the commencement of the action. 15 U.S.C. § 2619(b)(1). These notice requirements are mandatory pre-conditions to maintaining citizen lawsuits. *Hallstrom v. Tillamook County*, 493 U.S. 20, 31 (1989) (describing the notice requirement of citizen suit provision under the Resource Conservation and Recovery Act ("RCRA") as a "mandatory condition[] precedent to commencing suit under the RCRA citizen suit provision"); *Monogahela Power Co. v. Reilly*, 980 F.2d 272, 275 & n.2 (4th Cir. 1992) ("[c]itizen suit notice requirements are 'mandatory conditions precedent to commencing suit' and may not be avoided by employing a 'flexible or pragmatic' construction"); *Dodge v. Mirant Mid-Atlantic, LLC*, 732 F. Supp. 2d 578, 583 (D. Md. 2010) ("[T]he law is clear that notice is a mandatory prerequisite to suit under the [Clean Air Act]"); *Parker v. Hunting Point*

*Apartments, LLC*, No. 1:15-CV-00590, 2015 WL 5247692, at *2 (E.D. Va. Sept. 8, 2015), *aff'd*, 675 F. App'x 377 (4th Cir. 2017) (dismissing plaintiff's claims under Clean Air Act for lack of subject matter jurisdiction when plaintiff failed to comply with the Act's 60-day notice requirement); *Basel Action Network v. Maritime Admin.*, 370 F. Supp. 2d 57, 75 (D.D.C. 2005) (finding that the TSCA's 60-day notice period "is mandatory and cannot be waived").

Here, Graves mailed her notice of intent to sue to the EPA on November 29, 2021—only eight days before she filed her complaint on December 7, 2021. Compl. ¶ 24. Graves therefore did not comply with the mandatory 60-day notice requirements of the CAA and TSCA, and this Court dismisses these claims for lack of subject matter jurisdiction.[5] Because the defective notice cannot be cured by the filing of an amended complaint in this action, the Court declines to allow Graves to amend the Complaint to state a claim under the Clean Air Act and TSCA.

## C.   WITNESS TAMPERING, CONSPIRACY, AND MAKING A FALSE STATEMENT (COUNTS 5, 6, 7)

Graves brings claims under three federal criminal provisions: Count 5 alleges witness tampering in violation of 18 U.S.C. § 1512(b) against Foulger-Pratt (Compl. ¶ 104); Count 6 alleges conspiracy under 18 U.S.C. § 371 against all defendants (*id.* ¶ 105)[6]; and Count 7 alleges Foulger-Pratt made a false statement in violation of 18 U.S.C. § 1000(a)(2) (*id.* ¶ 106). Each of "these are criminal offenses which do not give rise to a private right of action supporting civil

---

[5]       Graves alleges that she "informally emailed" the EPA, among state and federal entities not identified as defendants in this action, "at least 60 days prior to filing this complaint." Compl. ¶ 24. The implementing regulations of the Clean Air Act specifically provide that service of a citizen's notice of intent to sue "shall be accomplished by certified mail." 40 C.F.R. § 54.2(a). The TSCA's implementing regulations provides that a citizen's notice of intent to file suit "can either be personally served or served by certified mail – return receipt requested[.]" 40 C.F.R. § 702.61(b). Graves's "informal[] email" is not an authorized method of service under either statute for the purposes of the 60-day notice requirement. Moreover, the Complaint provides no details regarding the content of his email correspondence. Even if email were an authorized method of service, the Complaint would still fail to allege that the content of the email satisfied the notice requirement.

[6]       The Court notes that Graves has stated that she voluntarily dismissed the criminal conspiracy action in one of her opposition briefs.

liability." *Hussell v. Jackson Cty. Prosecuting Atty.*, No. 2:19-cv-00101, 2020 WL 4210487, at *13 (S.D. W. Va. Feb. 14, 2020); *see also Fiorino v. Turner*, 476 F. Supp. 962, 963 (D. Mass. 1979) ("With regard to the alleged violations of 18 U.S.C. [§§] 371[] and 1001, plaintiff has failed to cite, and the court has been unable to locate, any authority which would support implying a civil cause of action for violations of these provisions. To the contrary, the case law indicates that violation of these statutes does not give rise to a civil cause of action."); *Doe v. Broderick*, 225 F.3d 440, 447 (4th Cir. 2000) ("The Supreme Court historically has been loath to infer a private right of action from 'a bare criminal statute.'"). Accordingly, this Court dismisses these claims for failure to state a claim under Rule 12(b)(6). Because no further amendment can cure these deficiencies, these claims are dismissed with prejudice. *Cozzarelli v. Inspire Pharm., Inc.*, 549 F.3d 618, 630 (4th Cir. 2008) (affirming dismissal with prejudice under Rule 12(b)(6) where "amendment would be futile in light of the fundamental deficiencies in plaintiff['s] theory").

### D.    FAIR HOUSING ACT (COUNT 4)

Under Count 4, Graves alleges that the City of Alexandria and Foulger-Pratt have violated the Fair Housing Act ("FHA") by failing to make any reasonable accommodations for her "[i]nability to breathe," which Graves alleges is a disability. Compl. ¶ 103. Graves allegedly "expressed to [Foulger-Pratt's regional property manager] that [she] was experiencing trouble breathing inside of the apartment" but that the manager informed Graves that she "was only permitted to stay in an affordable unit" and "failed to explain how the units are different beyond rental amount." *Id.* Graves further alleges that Foulger-Pratt denied Graves the option of transferring to certain 1-bedroom units similar to the one she occupied because those units were not available under the City of Alexandria's affordable housing program. *Id.* ¶ 87. Graves was ultimately transferred to a new unit within the apartment complex without penalty on December 7, 2019. *Id.* ¶ 11.

It is unlawful under the FHA to "make unavailable or deny . . . a dwelling to any buyer or renter because of a handicap," 42 U.S.C. § 3604(f)(1), or to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of a handicap." 42 U.S.C. § 3604(f)(2). A handicap is defined as "a physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. § 3602(h). To state a claim alleging a failure to accommodate under the FHA, a plaintiff must show that "the accommodation is (1) reasonable and (2) necessary (3) to afford handicapped persons equal opportunity to use and enjoy housing." *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 124 F.3d 597, 603 (4th Cir. 1997). "To survive a motion to dismiss an FHA discrimination claim, a plaintiff must plead facts that demonstrate a sufficient nexus between the alleged disability and discriminatory act—in this case, the denial of reasonable accommodations." *Fedynich v. Lozano*, No. 3:20-cv-260, 2021 WL 710368, at *7 (E.D. Va. Feb. 23, 2021) (dismissing FHA claim for failure to plausibly allege both that plaintiff qualified as disabled under the FHA and that defendants refused to provide them necessary accommodations); *Hardaway v. Equity Residential Mgmt., LLC*, No.11-cv-1924, 2012 WL 3903489, at *6 (D. Md. Sept. 6, 2012) (dismissing FHA claims where plaintiff failed to "elaborate on nature of [the plaintiff's] disability" and where plaintiff failed to "allege[] a plausible nexus between her disability and the alleged discriminatory acts").

Graves has failed to state a plausible allegation of disability discrimination under the FHA. First, Graves has not sufficiently alleged that she qualified as disabled under the FHA. Graves alleges that she was unable to breathe (Compl. ¶ 103), and that "physicians help[ed] to keep her airways open while inside of the apartment" (*id.* ¶ 88). These factual allegations are vague and abstract, leaving the Court unable to determine whether Graves qualifies as disabled under the FHA.

Indeed, Graves alleges that doctors informed her she "*did not* have asthma, environmental allergies, or sinus complications and mold was not found in [her] blood." *Id.* ¶ 8 (emphasis added).

Second, Graves has failed to plead facts to demonstrate a sufficient nexus between the alleged disability and the denial of reasonable accommodations. With respect to the City of Alexandria, although Graves at one point alleges that the City "was able to offer [her] an exit out of her lease agreement with Foulger-Pratt without any liability," (Compl. ¶ 6), Graves provides no further details about this offer and does not allege that the City played any other role in considering her request for a transfer of a unit within the Thornton. Regarding defendant Foulger-Pratt, Graves likewise fails to draw a sufficient nexus of causation between her alleged disability and Foulger-Pratt's actions. "To state a claim under the FHA, [a plaintiff] must show that the defendants denied her housing '*because of*' her handicap." *Thomas v. The Salvation Army S. Territory*, 841 F.3d 632, 639 (4th Cir. 2016) (citing 42 U.S.C. § 3604(f)(1)) (emphasis added). The Complaint is devoid of facts giving rise to any inference that Foulger-Pratt denied Graves a transfer to another unit within the Thornton *because of* her "inability to breathe." To the contrary, the Complaint suggests that Foulger-Pratt took steps to address Graves's concerns about the air quality in her apartment unit. Indeed, Graves alleges that a company performed an air quality inspection on her unit on November 6, 2019 and that Foulger-Pratt did in fact transfer Graves to another unit within the Thornton at no cost on December 7, 2019. Compl. ¶ 9, 11. Accordingly, the Court dismisses the claims of violations under the FHA for failure to state a claim.

### E.   VIOLATION OF FAIR DEBT COLLECTIONS PRACTICES (COUNT 8)

Graves alleges that defendants Foulger-Pratt; Kurman; TAM General Contracting; Manosalva; and Warfield violated the Fair Debt Collections Practices Act ("FDCPA"). Compl. ¶ 107. Graves alleges that Foulger-Pratt "fraudulently identified damages that never occurred," and that Kurman and Warfield "fraudulently pursued Foulger-Pratt's inaccurate debt and payment

omissions" "for services rendered by TAM or Mansolava to repair alleged structural damages," which Graves speculates was "intended to portray [her] as contributor[il]y negligent." *Id.* ¶¶ 20, 107. The invoice by Foulger-Pratt "appeared to be for the normal wear and tear for paint and small holes for picture hanging," which Graves claims she is "not liable for according to the lease agreement." *Id.* ¶ 107. She further alleges that "Warfield continues to mail letters pursuing a fraudulent debt." *Id.* ¶ 20.

Graves alleges that this conduct violates 15 U.S.C. § 1692(e), which prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." Warfield and Kurman challenge Graves's standing to raise an FDCPA claim on the grounds that she has failed to allege a particularized, concrete injury in fact resulting from the attempts to collect debt owed by Graves to Foulger-Pratt. Warfield Mem. (Dkt. No. 37) at 4–6; Kurman Mem. (Dkt. No. 50) at 5–7. Because Article III standing implicates this Court's subject matter jurisdiction, the Court's analysis begins (and ends) with this threshold analysis. S*pokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy.").

It is Graves's burden to demonstrate that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338. To plead an injury in fact, a plaintiff must "allege an injury that is both 'concrete *and* particularized.'" *Id.* at 334. "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* at 341; *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("[A]n injury in law is not an injury in fact"). In *TransUnion*, the Supreme Court held that a group of class member plaintiffs alleging a violation of the Fair Credit Reporting Act suffered a concrete injury—and thus had standing to sue under

the statute—where misleading credit reports were provided to third parties, but that another group of class member plaintiffs did not have standing where those reports were maintained within the credit report agencies and had not been disseminated to third parties. *See* 141 S. Ct. at 2209, 2212.

Although some courts have previously recognized that a plaintiff has standing under the FDCPA based solely on an alleged violation of the FDCPA, *e.g., Biber v. Pioneer Credit Recovery*, 229 F. Supp. 3d 457 (E.D. Va. 2017), that conclusion no longer appears viable after *TransUnion*, which requires plaintiffs alleging statutory violations to also have suffered concrete injuries in order to have Article III standing. While "important questions about the scope of standing to sue under the FDCPA remain in the wake of *Transunion*," *Lezark v. I.C. Sys., Inc.*, No. 22-1804, 2023 WL 2609815, at *3 (3d Cir. Mar. 23, 2023), several courts of appeals have rejected plaintiffs' FDCPA claims for lack of a concrete injury.[7]

Accordingly, because an allegation of a mere violation of the FDCPA cannot confer standing upon Graves, she must have suffered a concrete injury beyond the mere statutory violation itself in order to have standing to raise an FDCPA claim. That is, the Court must determine "whether the asserted harm [under a statutory violation] has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2200. Here, Graves alleges that the collection of debts were "fraudulent[]." Compl. ¶ 107.

---

[7]     *Shields v. Pro. Bureau of Collections of Maryland, Inc.*, 55 F.4th 823, 827–28 (10th Cir. 2022) (no standing under FDCPA where plaintiff failed to plead that the allegedly misrepresentation of debt in letter cause her to *do* anything, and plaintiff's "confusion and misunderstanding are insufficient to confer standing"); *see also Perez v. McCreary v. Veselka, Bragg & Allen, P.C.*, 45 F.4th 810, 821–26 (5th Cir. 2022) (vacating class certification order and remanding case alleging FDCPA violations with instruction to dismiss for lack of jurisdiction based on plaintiff's lack of standing); *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 775 (2023) (concluding that dunning letter sent by debt collector might have created a risk that consumer would suffer a harm, the consumer did not experience a concrete injury giving her standing to pursue claims for money damages in federal court); *Ward v. Nat'l Patient Acct. Servs. Sols., Inc.*, 9 F.4th 357, 363 (6th Cir. 2021) (finding that because plaintiff "failed to show more than a bare procedural violation of the FDCPA, he [did] not have standing to bring his claims"); *Bassett v. Credit Bureau Servs., Inc.*, 60 F.4th 1132, 1138 (8th Cir. 2023) ("[b]ecause [plaintiff] did not suffer a concrete injury in fact as a result of the alleged statutory violations, she lacks Article III standing").

The common law of fraud requires detrimental reliance. *Xia Bi v. McAuliffe*, 927 F.3d 177, 184 (4th Cir. 2019) ("'[r]easonable, detrimental reliance upon a misrepresentation is an essential element of a cause of action for fraud . . . and such reliance must be pleaded with particularity'") (citing *Learning Works, Inc. v. The Learning Annex, Inc.*, 830 F.2d 541, 546 (4th Cir. 1987)); *Pruitt v. Resurgent Cap. Servs.*, LP, 610 F. Supp. 3d 775, 781 (D. Md. 2022) (finding no standing to pursue an FDCPA claim where plaintiff alleged that communication with debt collector misled plaintiff to her detriment and prevented her from providing an adequate response but where plaintiff provided no allegations as to how the communication did so); *Shields*, 55 F.4th at 830 (finding plaintiff has no standing to raise FDCPA claim and reasoning that "fraud recognizes that harm may flow from relying on a misrepresentation, and [plaintiff] never pleaded reliance"). Here, Graves fails to plead any factual allegations that she relied on the fraudulent misrepresentations in any way to her detriment. In fact, the Complaint is completely devoid of facts even about the debt collection practices of or the content of any correspondence from Foulger-Pratt, Warfield, Jurman, TAM General Contracting, or Manosalva.

Nor is Graves able to articulate an alternative theory of concrete harm that would confer standing to raise an FDCPA claim. In her opposition briefing, Graves alleges that the harm she suffered bears a close relationship to "defamation, invasion of privacy, and emotional distress." Pl. Opp. to Warfield Mot. (Dkt. No. 39) at 15. Regarding defamation, the Complaint does not allege any facts supporting "[a] fundamental requirement of an ordinary defamation claim—publication."[8] *TransUnion*, 141 S. Ct. at 2210 n.6. Graves does not allege in her Complaint, for

---

[8] As discussed above, the Court declines to consider any factual allegations raised in Graves's briefing for the first time, including that at least one defendant filed the allegedly fraudulent debt with a credit reporting agency. *See* Pl. Opp. to Warfield Mot. (Dkt. No. 39) at 7. The Court notes, however, that even if the credit reporting agency included misleading information in its own internal reports, Graves would still lack standing because her allegations do not reflect that those reports were not disseminated to parties outside of the credit agency. *TransUnion*, 141 S. Ct. at 2210 n.6.

instance, that any allegedly incorrect information was made known to a third party. Nor does the Complaint allege facts to support the theory that the harm she allegedly suffered bears a close relationship to the tort of "invasion of privacy." *See Perez*, 45 F.4th at 826 (in the context of allegations of FDCPA violations, noting that "[o]ther circuits have also rejected the use of privacy-related torts to bootstrap standing when a plaintiff sues a defendant for violating statutory provisions that do not involve privacy."). Finally, any emotional distress by Graves about the situation is insufficient to confer standing under these circumstances. *See Pierre*, 29 F. 4th at 939 (plaintiff's testimony that she experienced "emotional distress arising from her concern about being sued for the debt. But worry, like confusion, [was] insufficient to confer standing in this context"). Accordingly, Graves has failed to allege a concrete injury for the purposes of Article III standing under the FDCPA. This Court therefore lacks subject matter jurisdiction over this claim and dismisses the FDCPA claim without prejudice.[9]

### F.    STATE LAW CLAIMS (COUNTS 9–14)

Having dismissed each cause of action that would give rise to federal question jurisdiction, the remainder of the Complaint (Counts 9 through 14) presents only state law claims.[10] A federal district court "may decline to exercise supplemental jurisdiction" over state law claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c); *Waybright v. Frederick Cty., Md.*, 528 F.3d 199, 209 (4th Cir. 2008) ("With all its federal questions gone, there may be the authority to keep [the case] in federal court[,] . . . but there is no good

---

[9]    A dismissal based on lack of subject matter jurisdiction "must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013).

[10]    Graves has only alleged that the court has jurisdiction over her claims pursuant to federal question jurisdiction and does not allege jurisdiction based on diversity. Compl. ¶ 22. With respect to the remaining state law claims, each of which are brought against Foulger-Pratt, Graves has failed to allege the citizenship of any, let alone all, of the members of the limited liability companies she has identified within the "Foulger-Pratt" entities. Graves therefore has not demonstrated facts to satisfy the requirement for diversity jurisdiction. 28 U.S.C. 1332.

reason to do so."). Lacking subject matter jurisdiction under 28 U.S.C. § 1331, the Court declines to address the sufficiency of these state law claims because there is no basis to exercise supplemental jurisdiction under 28 U.S.C. § 1367.

## IV.    CONCLUSION

For the reasons stated above, the motions to dismiss the Complaint filed by defendants City of Alexandria (Dkt. No. 11); Thornton Residential Holdings, LLC, Foulger-Pratt Companies, LLC, FP Alexandria, LLC, Foulger-Pratt Residential, LLC, Foulger-Pratt Management, LLC, Foulger-Pratt Development, LLC, Foulger-Pratt Contracting, LLC, and Thornton Residential Holdings Title Holder LLC (Dkt. No. 16); Robert J. Robertson and Apartment Restorers, LLC (Dkt. No. 19); Hunter Warfield, Inc. (Dkt. No. 36); R. Christopher Goodwin & Associates, Inc. (Dkt. No. 46); Offit Kurman, P.A. (Dkt. No. 49); SREIT Thornton at Alexandria, LLC (Dkt. No. 53); the United States Environmental Protection Agency and Michael Regan, in his official capacity as Administrator of the United States Environmental Protection Agency (Dkt. No. 72); Compliance Environmental International, Inc. (Dkt. No. 75); and Progress Environmental, LLC (Dkt. No. 80), are **GRANTED**; and it is further

**ORDERED** that this action, including all claims raised in the Complaint against all defendants, is **DISMISSED**.

It is **SO ORDERED**.

*       *       *

Should Plaintiff wish to appeal this Memorandum Opinion and Order, Plaintiff must file a written notice of appeal with the Clerk of this Court within thirty (30) days of the date of the entry of this Memorandum Opinion and Order. A written notice of appeal is a short statement stating a desire to appeal an order and identifying the date of the order Plaintiff wants to appeal. Failure to

file a notice of appeal within the stated period may result in the loss of the right to appeal. The

Clerk is directed to forward copies of this Memorandum Opinion and Order to counsel of record

and Plaintiff *pro se*, and close this civil action.

_____/s/_____

Hon. Michael S. Nachmanoff
United States District Judge

Alexandria, Virginia
March 30, 2023